Lisa C. VANDEVENTER, Douglas L. Feltner, Rita Phelps, Brandi Jo Russell, and Sherry Wampler, Plaintiffs,

v.

WABASH NATIONAL CORPORATION, Defendant.

No. 4:93cv0046 AS.

United States District Court,
N.D. Indiana,
Hammond Division,
at Lafayette.

June 30, 1995.

Marshall R. Crawford, A. Robert Thayer, Chavez Crawford and Thayer, Lafayette, IN, for plaintiffs Lisa C. Vandeventer, Douglas L. Feltner, Rita Phelps, Brandi Jo Russell, Sherry Wampler.

Keith R. Fafarman, Jay T. Seeger, Robert L. Bauman, Ellen R. Klausen, Gambs, Mucker, Bauman, and Seeger, Lafayette, IN, for defendant Wabash Nat. Corp.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

There is much empirical evidence to support the conclusion that in this district much

of the judicial heavy lifting is done exceptionally well by the four United States magistrate judges. Certainly, such is the case reflected in the 70–page Report and Recommendation presented to this court by Magistrate Judge Cosbey on June 6, 1995. It comes as no great surprise to this court which has now been charged with the judicial management of this case for nearly two years. To be precise, since July 6, 1993. In more than two decades of handling the wide variety of district court litigation, it is hard for this judge to remember a case in which more wasted judicial time and effort has been expended.

In typical fashion representing an enormous expenditure of judicial time and resources,[1] Magistrate Judge Cosbey masterfully detailed this case as one of the sorriest examples of the way that this species of federal court litigation should be handled. Not surprisingly, a new barrage of paper has been filed by the defendant's attorneys objecting to the magistrate's Report and Recommendation. Attorneys Bauman and Klausen have filed a twenty-six (26) page Objection. They dwell at length on why Judge Cosbey should have assessed sanctions against Crawford and Thayer under § 1927 for various wrongs which the magistrate found not worthy of sanctions.

Frankly, those arguments are (like much of this saga) much ado about nothing. Judge Cosbey *did* find that attorneys Crawford and Thayer should be sanctioned under § 1927. Even if this court agreed that there were a couple of additional grounds for which sanc-

tions should be imposed, the amount or significance of the sanction would not change. Attorneys Bauman and Klausen do not even request that the sanction be increased. This court is not going to split any more hairs in this case. The magistrate judge's determinations were amply supported by fact and law, and will be adopted by this court.

Attorneys Bauman and Klausen also object to the recommendation that they be sanctioned. They seem to believe that they are being sanctioned for "vigorously defend[ing] this case" and failing to settle, which they acknowledge would have resulted in a lower immediate cost to Wabash and the court. That is not at all correct. This court does not desire or encourage that defendants settle baseless cases because it is cheaper short term. Far from it! Such is a myopic policy which has precipitated a deluge of civil filings in the past thirty years, and costs society and business a great deal more in the long run. There are some baseless suits filed by unscrupulous lawyers which are little better than blackmail, and permitting that stratagem to pay off in the short term has created at least ten-fold higher costs in the long run. Such unscrupulous efforts should be resisted, but through reasonable means.

The problem of baseless suits is being dealt with by the federal courts through strict application of the law and summary judgment standards. *See Russell v. Acme–Evans Co.*, 51 F.3d 64 (7th Cir.1995). Current Seventh Circuit law makes it almost impossible to get a baseless suit (and, unfor-

---

1. Magistrate Judge Cosbey has stated that the judicial costs incurred by these motions for sanctions was approximately $50,400.00, based on 84 hours of his time at $600.00 per hour. Such is undoubtedly a conservative estimate. He based that $600.00 figure on a decade-old case decided by Judge William C. Lee, *Robinson v. Moses*, 644 F.Supp. 975, 982–983 (N.D.Ind.1986), which in turn was based upon a 1985 law review article. With all deference to both Magistrate Judge Cosbey and Judge Lee, that $600.00 figure is now probably well out of date. A district court in Texas has more recently put the figure at $890.00 per hour in 1988. *See Seneca Resources Corp. v. Moody*, 135 B.R. 260, 261 (S.D.Tex.1991).

This court has no desire to engage in a numbers game as to the value of judicial time of United States district judges and United States

magistrate judges. But the value is substantial and the time resources of the federal judiciary have been the subject of a multitude of studies, articles, and legislation. For example, see the Civil Justice Reform Act of 1990, 28 U.S.C. §§ 471–482. Whether the cost of the judicial time of Judge Cosbey and of this court is figured at $600.00 per hour, $890.00 per hour or more, much of that time was unnecessary due to the conduct of counsel on both sides of this case. It should also be pointed out that Magistrate Judge Cosbey's time and cost analysis relates only to his time and not to the great amount of time that has been expended unnecessarily by this court. Under any analysis, this so-called "back alley knife fight" has probably cost the public at least $100,000.00 in valuable federal judicial resources.

tunately, many legitimate suits) to trial.[2] Summary judgment procedures, when used appropriately, provide an efficient and relatively inexpensive method of dealing with the problem of groundless suits. The expense is born most heavily by the plaintiff (*see Russell*), providing a prophylactic and punishing result for baseless suits.

Furthermore, there is a difference between a vigorous, effective defense and the kind of gross overlitigation and unreasonable and vexatious multiplication of proceedings which occurred here. Vigorous defense of their client is not the basis for the magistrate judge's recommendation of sanctions against Bauman and Klausen. The magistrate judge, himself a former state court trial judge, was precisely on target when he found that this entire case has been litigated like a "back-alley knife fight" (R & R at 860), and the defense often used a "grapeshot and canister defense, when one or two well-aimed rifle shots would have done nicely" (R & R at 858). This case turned into a very ugly war between the lawyers, which was a disservice to their clients, the court, and the legal system. Judge Cosbey detailed ample reasons in support of his recommendation for sanctions against Bauman and Klausen, and this court will adopt that recommendation.

This court considers the sanctions herein imposed to be nominal, and more educative than punitive. To that end, it is appropriate that all parties bear the same sanction. This court hereby **ADOPTS** the Report and Recommendation of Magistrate Judge Cosbey, and imposes a monetary sanction of $500.00 each on Crawford, Thayer, Bauman, and Klausen, to be paid into the office of the Clerk of this court within sixty (60) days of the date of this order.[3] However, each attorney may petition the court to set aside the monetary sanction by agreeing to attend and successfully completing, within one year from the date of this order, a CLE seminar as follows: attorneys Crawford and Thayer shall each attend a CLE seminar of at least six (6) hours on the substantive provisions of sexual harassment,[4] and attorneys Bauman and Klausen shall each attend a CLE seminar of at least six (6) hours on Rule 11 and/or federal practice. The court believes that this is a fair and equitable end to a case which has been a virtual catalog of what is wrong with litigation today.

With some reluctance but for very good and sound reasons, this court is going to submit this memorandum decision as well as the Report and Recommendation of Magistrate Judge Cosbey to the West Publishing Company for publication in either the Federal Supplement or the Federal Rules Decisions. The reasons for this publication are emphatic. One is to display to the relevant legal world the hard realities of dealing with this species of litigation and to demonstrate how cases such as this should not be handled. Another reason is to advise the relevant legal world that this court has the deepest respect for the basics of the adversarial system and, therefore, must and should protect the legitimate rights of advocacy in these kinds of cases. It may well be that this court was too indulgent too early and should have dropped the hammer on these lawyers sooner than it did. However, hope springs eternal and the court believing in the adversarial system hoped that sanity would prevail before more drastic action was necessary. Obviously, it did not.

The final reason for publication is to issue a specific warning to those who might want to engage in a repetition of this kind of adversarial misbehavior. This court would hope that the publication of this will be educational to all concerned. **IT IS SO ORDERED.**

---

**2.** There were valid and worthwhile issues in this case. It was certainly not baseless on all counts. It is unfortunately true that the strict summary judgment standards undoubtedly sometimes result in the dismissal of meritorious claims which simply lack sufficient evidentiary support.

**3.** The magistrate judge's additional recommended sanction, that each attorney certify that he or she has read and will abide by the Seventh Circuit's "Standards for Professional Conduct," has already been completed by the parties.

**4.** Attorneys Crawford and Thayer have already proposed a CLE seminar which this court wholly approves.

## REPORT AND RECOMMENDATION

COSBEY, United States Magistrate Judge.

### I. INTRODUCTION

On January 5, 1995, and in accordance with 28 United States Code section 636(b)(1)(B) of the Federal Magistrate's Act ("the Act") and N.D.Ind.L.R. 72.1(d) the district court entered an order referring this case to the undersigned Magistrate Judge to submit a Report and Recommendation on the Defendant Wabash National Corporation's ("Wabash") Motion for Sanctions filed December 27, 1994.[1] Wabash supported its motion with four extensive volumes of materials.[2]

The target of the Motion, attorneys Marshall Crawford and A. Robert Thayer, (hereinafter "the Attorneys") filed a response on January 4, 1995. It was at that point that the matter was referred to the undersigned Magistrate Judge.

On January 20, 1995, the Magistrate Judge conducted a prehearing telephone conference and ordered Wabash to file an intelligible reply brief (essentially, another opening brief) not exceeding twenty-five pages, on or before January 27, 1995. At the same conference, the Attorneys were ordered to file by February 6, 1995, a sur-response brief not exceeding twenty-five pages; Wabash was ordered to then file a sur-reply brief, not exceeding fifteen pages, by February 13, 1995.[3]

On January 27, 1995, Wabash filed its recast opening brief and the Attorneys filed a sur-response on February 6, 1995 (essentially a recast response brief).

Wabash then filed a fifteen page sur-reply on February 13, 1995, however, this page limit was only achieved by a thin ruse, devised by Wabash's counsel, all in an effort to circumvent the requirements of Local Rule 7.1(b) and the Magistrate Judge's January 20, 1995 order.[4] That sur-reply was stricken and Wabash was granted until February 24, 1995, to submit a proper sur-reply. On February 24, 1995, Wabash submitted another sur-reply (essentially a reply brief).

On April 18, 1995, the Magistrate Judge set the matter for hearing for May 18, 1995, and set a deadline for the filing of witness lists in the event that evidence had to be submitted. *Knorr Brake Corp. v. Harbil, Inc.,* 738 F.2d 223, 227–8 (7th Cir.1984) (citing *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 767, 100 S.Ct. 2455, 2465, 65 L.Ed.2d 488 (1980)) (Sanctions should not be assessed "without fair notice and an opportunity for a hearing on the record.") Counsel for both the Attorneys and Wabash subsequently waived the presentation of any testimony or evidence at the May 18, 1995 hearing. Counsel were granted, however, the opportunity to file additional briefs on the issue of the timeliness of the Rule 11 motion and the Attorneys (now ably represented by Attorney Hamilton) filed a brief on May 5, 1995; Wabash filed their brief on May 12, 1995. On May 18, 1995, the Magistrate Judge heard four and one-half hours of oral argument on the pending motion.

For the reasons hereinafter provided, it will be the recommendation of the undersigned Magistrate Judge that the Motion for Sanctions be GRANTED in part and DENIED in part. It will also be the recommendation of the undersigned Magistrate Judge

---

**1.** In the first of other violations of the Local Rules, Wabash submitted an oversized brief consisting of 45 pages without first seeking leave of court. *See* N.D.Ind.L.R. 7.1(b). The brief was not just overly long but also so unfocused that the Magistrate Judge ultimately ordered the briefing process to start over.

**2.** Hereafter referred to as, e.g., Wabash Vol. __, exh. __, p. __.

**3.** Up until January 20, 1995, the briefing by counsel for both sides had been less than illuminating. In fact, the undersigned Magistrate

Judge observed at the hearing that the Attorneys initial response was more like a "stream of consciousness" than an articulated legal position.

**4.** As discussed more fully *infra,* Wabash's surreply did not have proper margins, type size, spacing and was jammed with footnotes in minuscule type. In fact, the footnote type was so small that the undersigned Magistrate Judge needed a magnifying glass to read the footnotes comfortably. *See* Magistrate Judge's Order of February 14, 1995.

that the Court consider imposing sanctions on counsel for Wabash as hereafter provided.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Because the current motion only focuses on the issue of sanctions it is unnecessary to fully recount the entire history of this case. Briefly stated, however, on July 6, 1993, Douglas Feltner ("Feltner") and Rita Phelps ("Phelps"), along with two other plaintiffs, caused to be filed in the Lafayette Division of this Court, a civil complaint against Wabash. The complaint was signed and filed by the Attorneys. On July 30, 1993, an amended complaint was filed, again signed by the Attorneys, adding Sherry Wampler ("Wampler") as a plaintiff.[5]

The original complaint on behalf of Feltner purported to claim, *inter alia*, sexual harassment (Count III) while he was employed at Wabash, that he complained of such treatment and was ultimately terminated in retaliation on May 17, 1993. *See* Feltner complaint, Count III ¶ 4. While Feltner's complaint does not describe any conduct on the part of supervisors or anyone superior to Feltner, the complaint nevertheless alleged that the behavior was "nothing less than a classic example of sexual harassment, both '*quid pro quo*' harassment and 'hostile environment' harassment[.]" *See* Feltner complaint, Count III ¶ 11. Count IV of the Feltner complaint alleged retaliation for sexual harassment.

In the original Complaint Phelps claimed, *inter alia*, that she was hired at Wabash on November 20, 1992, that she also complained of sexual harassment, and was subsequently terminated on February 4, 1993, in retaliation. *See* Phelps complaint, Counts V and VI. Phelp's complaint, like Feltner's alleges both "classic" "*quid pro quo*" and "hostile environment" sexual harassment. *See* Phelps complaint, Count III ¶ 11.

The First Amended Complaint filed July 30, 1993, added Wampler who alleged, *inter alia*, that she was an employee of Wabash for one and a half years until "forced to quit on April 16, 1993, because of sexual harassment." *See* First Amended Complaint, Count XI ¶ 1. However, unlike Phelps and Feltner, Wampler alleged that she was the object of sexual harassment not only by employees, but also Wabash supervisors. Wampler Complaint, Count XI ¶ 8. Wampler also complained of "*quid pro quo*" harassment, and "hostile environment" sexual harassment, Wampler Complaint, Count XI ¶ 11; and retaliation for complaining of sexual harassment, *id.*, Count XII.

Ultimately, and after some discovery, Wabash filed the following Motions for Summary Judgment: on April 8, 1994 as to Feltner's claims; on May 11, 1994 as to Wampler's claims; on May 31, 1994 as to Phelps' claims. Feltner filed his response on May 31, 1994; Wampler filed her response on July 1, 1994; and Phelps filed her response on October 31, 1994.

On July 28, 1994, and while these motions were still pending, counsel for Wabash sent to the Attorneys "advanced service copies" of two sanction motions directed against all five Plaintiffs (including both Vandeventer and Russell, neither of whom are the subject of the current sanction motion) as well as the Attorneys.[6] *See* exh. 1 to Wabash's reply brief. The first served, but unfiled motion regarding sanctions alleged that there had been a violation of Rule 11 ("Rule 11") of the Federal Rules of Civil Procedure by virtue of, *inter alia*,[7] the following: (1) both the original Complaint and the Amended Complaint alleged *quid pro quo* sexual harassment, and thus were signed and filed in

---

5. With the addition of Wampler, the number of Plaintiffs now came to (5) five: Vandeventer, Russell, Feltner, Phelps and Wampler.

6. Russell's and Vandeventer's hostile environment sexual harassment claims survived summary judgment and Wabash then settled with them; however, by the time the settlement was memorialized the Attorneys were no longer representing either client. This will be discussed more fully, *infra*.

7. The served, but unfiled Rule 11 motion also alleged other violations of Rule 11 but they are not the subject of the current motion and need not be discussed here.

violation of Rule 11(b)(1), (2), (3);[8] (2) Feltner's asserted reliance on the doctrine of *res judicata* in responding to the pending Motion for Summary Judgment violated Rule 11(b)(1), (2); (3) the affidavits filed in support of Feltner's and Wampler's opposition to Wabash's Motion for Summary Judgment contained statements that were not based on the affiants' personal knowledge and were contrary to the affiants' deposition testimony in violation of Rule 11(b)(1); (4) the affidavit of Tonya Matthews ("Matthews") accompanying Feltner's response to Wabash's Motion for Summary Judgment was never signed by the affiant and was filed in violation of Rule 11(b)(1).

The second served but unfiled Motion for Sanctions alleged a violation of 28 United States Code section 1927 ("§ 1927)", *inter alia*,[9] as follows: (1) the Attorneys failed to make a reasonable factual investigation or inquiry into the legal basis for the Plaintiff's allegations of *quid pro quo* sexual harassment both before and after filing the Complaint and the Amended Complaint; (2) the Attorneys have persisted in pressing allegations of *quid pro quo* sexual harassment despite no factual or legal basis for doing so;[10] (3) the affidavits filed in response to Wabash's Motion for Summary Judgment as to Plaintiffs Feltner and Wampler contained statements not based upon the affiants personal knowledge and contrary to the testimony elicited in the affiants' deposition testimony; (4) the argument that the doctrine of *res judicata* applies to Feltner's claims is sanc-

tionable; (5) the affidavit of Matthews accompanying Feltner's response to Wabash's Motion for Summary Judgment was never signed by the affiant. *See* Exhs. 2 and 3 to Wabash's reply brief.

Ultimately, while the case proceeded towards trial, counsel for both sides became involved in numerous procedural scraps. Indeed, that is a bit of an understatement. The Court, frustrated with the behavior of counsel, set the matter for a hearing for October 3, 1994, at 9:30 a.m. at which time the Court was to "take up all outstanding discovery disputes and motions." *See* Court's order of September 22, 1994. Beforehand, counsel were to meet "to resolve all pending discovery disputes and pending motions." *Id.*

As a result of this guidance, counsel for both sides met and submitted a "Joint Statement" to the court on September 30, 1994, relating that counsel had met in "an attempt to resolve outstanding discovery disputes." *See* Joint Statement, p. 1. Although the Joint Statement then spoke to a number of discovery-type issues, it did not purport to deal with all issues before the court: for example, the "Joint Statement" relates: "[e]xcept for the pending motions still before this court (Wabash's Motion to Reconsider the Imposition of Costs for Depositions Upon Written Questions, and Plaintiffs' Response; and Wabash's Motions for Summary Judgment, and Plaintiffs' Responses), all of which are to be determined solely by the court, there are no other outstanding discovery is-

**8.** Noticeably absent from both "served" sanction motions but present in the currently filed motion is the allegation that the attorneys advanced a frivolous retaliatory discharge claim. In fact, Wabash's counsel conceded at oral argument that as to this claim there has never been any attempt to comply with amended Rule 11's "safe harbor" provision, Fed.R.Civ.P. 11(c)(1)(A). Additionally, the current motion can hardly be considered timely as to this issue given that Wabash waited for a favorable ruling on the claim before ever advancing this motion—resulting in nothing to show "withdrawn" within the meaning of amended Rule 11. *Id. See* additional discussion at pp. 841–844, *infra.*

Finally, unlike the filed motion, the "served" motion takes no issue with the *quid pro quo* sexual harassment claims being repeated in the Attorneys' response to Wabash's Motion for Summary Judgment. For this reason, new Rule 11

has not been complied with here either, since Wabash never "served" a Rule 11 motion on this point before filing the present one. *In re VMS Securities Litigation,* 156 F.R.D. 635 (N.D.Ill. 1994). Indeed, the same holds true for the supposedly sanctionable motions to reconsider (again, never the subject of a "served" motion). *Id.*

**9.** This second motion was similar in scope to the one alleging a violation of Rule 11. However, the reason the motion was served at all is unclear because § 1927, in contrast to Rule 11, does not require the prior service of a motion.

**10.** For some reason this allegation was in this served motion, but not in the served Rule 11 motion. It's absence from the served Rule 11 Motion proves fatal now. *See* fn. 8, *supra.*

sues as between the parties in this cause." *Id.* at ¶ 7. As a result of the "Joint Statement" the court cancelled the October 3, 1994 hearing. *See* Order of September 30, 1994. The Attorneys now suggest that the "Joint Statement" also settled all sanction issues then outstanding between themselves and Wabash.

Thereafter, on October 17, 1994, the court granted Wabash summary judgment against Feltner. On October 27, 1994, the court granted Wabash summary judgment against Wampler. On November 10, 1994, the Court granted summary judgment in favor of Wabash and against Phelps.[11] Phelps has not filed a motion to reconsider.

On October 24, 1994, the Attorneys, on behalf of Feltner filed a Motion for Reconsideration as to the granting of summary judgment on his *quid pro quo* sexual harassment claim.[12] *See* Wabash Vol. III, exh. N. On October 26, 1994, the court, without a response from Wabash, denied the Motions for Reconsideration. On October 31, 1994, Wampler also filed a Motion for Reconsideration as to the granting of the *quid pro quo* sexual harassment claim (Wabash Vol. III, exh. O) and that was denied on November 2, 1994.[13] On November 17, 1994, the Clerk entered judgment in favor of Wabash and against the Plaintiffs.[14]

On November 21, 1994, Plaintiff Wampler filed a Motion to Reconsider the court's granting of summary judgment against her.[15] On November 22, 1994, Wabash filed a response. Wampler submitted a reply on November 28, 1994. That motion has yet to be ruled on and is not an issue here.

On December 27, 1994, Wabash filed its present sanctions motion. As Wabash sees it, the Attorneys violated both Rule 11 and § 1927 in the following six respects:

(1) by asserting claims of *quid pro quo* sexual harassment and retaliatory discharge in the amended complaint filed on behalf of plaintiffs Feltner, Phelps and Wampler that lacked a basis in the facts and in the law; (2) by repeating their assertions of *quid pro quo* sexual harassment and retaliatory discharge in their responses to Wabash's motions for summary judgment filed in regard to these three plaintiffs' claims; (3) by filing responses to Wabash's motion for summary judgment containing misstatements of the law; (4) by making misrepresentations of the deposition testimony of plaintiffs Feltner, Wampler and Phelps and attaching conclusory affidavits of these same plaintiffs that lack factual support and contradict their sworn deposition testimony; (5) by filing motions for reconsideration of this Court's Orders in which they again asserted unfounded claims of *quid pro quo* sexual harassment; and, (6) by presenting an altered affidavit in support of their response to Wabash's motion for summary judgment in plaintiff Feltner's case.

Wabash's reply brief, p. 1.

The Attorneys' dispute that they violated either Rule 11 or § 1927, and they also argue that the current motion is not timely; they also contend that the "Joint Stipulation" filed with the court on September 30, 1994, was intended to resolve all disputes, including all sanction issues.

11. On November 18, 1994, the Court entered its formal opinion granting Wabash summary judgment against Phelps.

12. Although the court's docket sheet lists both Wampler and Phelps as joining in this motion, they did not.

13. At oral argument the undersigned Magistrate Judge remarked that Wabash could not have expended fees in responding to the Feltner's and Wampler's Motion for Reconsideration given that they were denied by the Court within days of their being filed. Counsel for Wabash replied that they had been "working on a response" when they received notice that the motions had

been denied. While no evidence was presented on this point, the undersigned Magistrate Judge is dubious about such a claim given the very close temporal proximity of the filings and the court's ruling.

14. Feltner filed another motion on to reconsider on April 18, 1995, but it was denied by a superseding order on May 23, 1995.

15. Neither Wampler's Motion to Reconsider, which actually is to be considered as a motion to alter or amend judgment, *U.S. v. Deutsch,* 981 F.2d 299 (7th Cir.1992) nor her reply to Wabash's response, makes any mention of *quid pro quo* sexual harassment.

The Court will discuss these issues in turn, but first will discuss the standard under which the sanction motion must be viewed.

## III. STANDARDS ON RULE 11 AND SECTION 1927

### A. Identifying the Applicable Rule 11

During the pendency of these proceedings, and after the filing of the complaint and the amended complaint, Rule 11 was amended. Since the alleged sanctionable activity straddles the two versions of Rule 11, the Court will discuss the applicability of both.

▆ To highlight the differences, and to oversimplify, Rule 11 as it existed prior to December 1, 1993 ("old Rule 11"), made the imposition of sanctions mandatory once it was determined that the Rule had been violated. *Land v. Chicago Truck Drivers, Helpers and Warehouse Workers Union, Health and Welfare Fund,* 25 F.3d 509, 515 (7th Cir.1994). However, under amended Rule 11 ("new Rule 11"), effective December 1, 1993, the imposition of sanctions is within the discretion of the district court even after a violation has been identified. *Id.* The new Rule 11 also differs from its predecessor in that it requires arguments "for the extension, modification, or reversal of existing law" to be "non-frivolous," rather than made in "good faith." *Id.* at p. 516, n. 10 (citing *Knipe v. Skinner,* 19 F.3d 72, 78 (2nd Cir. 1994)).

▆ The new Rule 11 governs "all proceedings in civil cases thereafter commenced [after December 1, 1993] and, in so far as just and practicable, all proceedings in civil cases then pending." 146 F.R.D. 404 (April 22, 1993) (Supreme Court amending the Federal Rules of Civil Procedure). Wabash takes the view that conduct that occurred prior to December 1, 1993, should be viewed under old Rule 11 and that conduct which occurred after December 1, 1993, should be assessed under new Rule 11. The Attorneys argued for the first time at the May 18, 1995 hearing that all of the conduct should be assessed under new Rule 11 since the majority of the alleged sanctionable events occurred after December 1, 1993, and because the sanction motion was not filed until almost thirteen months after that date.

Some guidance on this point has come from the Seventh Circuit. In *Land,* the district court denied sanctions even though both the sanctionable pleading and the Rule 11 motion were filed before the effective date of the amended Rule. The Seventh Circuit reasoned that if the new (and discretionary) Rule 11 applied, it could make a difference in the Court's analysis given that it would permit affirmation of the district court's denial of sanctions as an appropriate exercise of discretion. 25 F.3d at 516. However, since the case had to be decided under old Rule 11, sanctions were mandatory, and the Seventh Circuit remanded the case to the district court for the imposition of those sanctions. *Id.* at 518. Thus, the Seventh Circuit followed several other cases by holding that courts should not apply new Rule 11 to conduct that occurred prior to the effective date of the amendment. *Id.* Thus, it would appear that in the Seventh Circuit the view is that district courts should apply old Rule 11 to pre-amendment conduct even if that former Rule yields a harsher result. *See Doe v. Maywood Housing Auth.,* 1994 WL 521050 (N.D.Ill.) *7 n. 3.

On the other hand, if the offending conduct has occurred after December 1, 1993, and if the motion for sanctions was filed after that date, courts have applied new Rule 11. *See Agretti v. ANR Freight System, Inc.,* 1994 WL 46670 (N.D.Ill.) *1; *Burkhalter v. Brisk Transportation, Inc.,* 1994 WL 280073 (N.D.Ill.) *5 n. 2. Indeed, it seems that the question of what Rule 11 to apply turns on when the sanctionable conduct occurred, regardless of when the sanction motion was filed or considered. *Doe,* 1994 WL 521050 at *7 n. 3. In short, the court should only charge a party with knowledge of that version of the Rule that was in effect at the time of filing. *Land,* 25 F.3d at 516 (citing *Knipe,* 19 F.3d at 78).

As a consequence then, it will be the recommendation of the undersigned Magistrate Judge that conduct occurring prior to December 1, 1993, be judged under old Rule 11; concomitantly, conduct occurring after December 1, 1993, should be judged under new Rule 11.

## B. Old Rule 11

To the extent old Rule 11 applies, the court's analysis begins with a review of its text, which provides in pertinent part:

Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name.... The signature of an attorney ... constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

■ The core of old Rule 11 is that the signer of a document is certifying that "after reasonable inquiry [the pleading, motion, or other paper] is well grounded in fact and is warranted by existing law[.]". *See Business Guides, Inc. v. Chromatic Communications Enters., Inc.,* 498 U.S. 533, 542, 111 S.Ct. 922, 929, 112 L.Ed.2d 1140 (1991). *See also, Teamsters Local No. 579 v. B & M Transit, Inc.,* 882 F.2d 274, 280 (7th Cir.1989). Thus, old Rule 11 sanctions cannot be avoided by some subjective belief that the law or facts are a certain way; the "reasonable inquiry" language makes the test an objective one. *Business Guides, Inc.,* 498 U.S. at 548–50, 111 S.Ct. at 932; *Indianapolis Colts v. Mayor and City of Baltimore,* 775 F.2d 177, 181 (7th Cir.1985); *Glick v. Koenig,* 766 F.2d 265, 270 (7th Cir.1985). *See also, Thornton v. Wahl,* 787 F.2d 1151, 1154 (7th Cir.1986), *cert. denied,* 479 U.S. 851, 107 S.Ct. 181, 93 L.Ed.2d 116 (1986) ("An empty head but a pure heart is no defense. The Rule requires counsel to read and consider before litigating.... It is not acceptable to make an assertion of law and hope that it will turn out to be true.").

■ The Notes of the Advisory Committee and the Federal Rules make it clear that old Rule 11's provisions are designed to "discourage dilatory or abusive tactics and [to] help streamline the litigation process by lessening frivolous claims or defenses." *See also Dominguez v. Figel,* 626 F.Supp. 368, 373 (N.D.Ind.1986). The Supreme Court has stated that the purpose of Rule 11 "is not reimbursement but 'sanction.'" *Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 126, 110 S.Ct. 456, 460, 107 L.Ed.2d 438 (1989). *See also, Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 404, 110 S.Ct. 2447, 2460, 110 L.Ed.2d 359 (1990) (the goal of Rule 11 is specific and general deterrence); *Brandt v. Schal Assocs., Inc.,* 960 F.2d 640, 645 (7th Cir.1992) (noting that the rule's emphasis is punitive rather than compensatory).

■ Simply stated, the court must impose sanctions under old Rule 11 where: (1) the filing is frivolous, or (2) where the filing was interposed for an improper purpose, such as to harass. *See Brown v. Federation of State Medical Boards of United States,* 830 F.2d 1429, 1435–36 (7th Cir.1987); *see also, Zaldivar v. City of Los Angeles,* 780 F.2d 823, 830–31 (9th Cir.1986), *abrogated on other grounds, Cooter,* 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359. If a pleading violates either of these principles, the court "shall impose" an appropriate sanction, "which may include the amount of reasonable expenses and attorney fees incurred by the other party because of the filing of the pleading or motion." *Brown,* 830 F.2d at 1433; *Szabo Food Service, Inc. v. Canteen Corp.,* 823 F.2d 1073, 1082 (7th Cir.1987), *cert. dismissed,* 485 U.S. 901, 108 S.Ct. 1101, 99 L.Ed.2d 229 (1988).

As to the first point, the focus becomes whether claims in the filing were "colorable enough to avoid sanctions for frivolity." *National Wrecking Co. v. Int'l Brotherhood of*

*Teamsters,* 990 F.2d 957, 963 (7th Cir.1993). Even if the arguments are losers, the issue is whether they "rise to the level of groundlessness required for Rule 11 sanctions." *Id.* *See also, Gottlieb v. Westin Hotel Co.,* 990 F.2d 323, 328 (7th Cir.1993) (Sanctions can be imposed if a claim is "clearly foredoomed by reasonable inquiry into the law and the facts.").

█ As to the "any improper purpose" component of old Rule 11, subjective bad faith may be important even when the suit is objectively colorable. *Brown,* 830 F.2d at 1436; *see also, Mars Steel Corp. v. Continental Bank N.A.,* 880 F.2d 928, 930 (7th Cir. 1989) (*en banc* ) (Seventh Circuit applies deferential standard of review "whether the question be frivolousness on the objective side of Rule 11 or bad faith on the subjective side."). However, where there is no direct evidence of subjective intent the courts have applied the objective test and have inferred improper purpose when a certified document (1) is meritless, and (2) results in delay, harassment, a needless increase in costs, or some other illegitimate result. *See* 1 M.F. Derfner & A.D. Wolf, *Court Awarded Attorney Fees* § 11.05[d][i]. Most courts refuse to *infer* an improper purpose from a filing which is well-grounded in fact and warranted by law. *Id.*

█ In this circuit, old Rule 11 does not impose a continuing obligation upon attorneys to re-evaluate the merits of the case as the litigation develops. *Dahnke v. Teamsters Local 695,* 906 F.2d 1192, 1201 (7th Cir.1990). *Cf.* § 1927 as discussed *infra.*

█ Old Rule 11 permits the court to impose sanctions "upon the person who signed [the filing], a represented party, or both." *See* 5A WRIGHT AND MILLER, FEDERAL PRACTICE AND PROCEDURE: Civil 2d, § 1336 (1990) ("The court's discretion includes the power to impose sanctions on the client alone, solely on the counsel, or on both."); 2A J. MOORE AND J. LUCAS, MOORE'S FEDERAL PRACTICE, § 11.02[4–1] (1993) (same); *see also, Kapco Mfg. Co. v. C & O Enters., Inc.,* 886 F.2d 1485, 1489 (7th Cir.1989) (Trial court's imposition of Rule 11 attorney fees against plaintiff and plaintiff's counsel, "joint-ly and severally" affirmed.). The burden of proof is on the Rule 11 fee opponent to establish objective reasonableness and adequate pre-filing investigation once a *prima facie* showing of sanctionable conduct has occurred. *Shrock v. Altru Nurses Registry,* 810 F.2d 658 (7th Cir.1987); *see also, Bannon v. Joyce Beverages, Inc.,* 113 F.R.D. 669, 674 (N.D.Ill.1987). One of the purposes of the Rule is to place the burden of reasonable investigation on the proponent of a proposition, rather than on the opponent. *Johnson v. A.W. Chesterton Co..* 18 F.3d 1362, 1366 (7th Cir.1994).

█ Nonetheless, in determining whether to impose sanctions, "all doubts must be resolved in favor of the signer." *Insurance Benefit Administrators, Inc. v. Martin,* No. 84 C 10355, 1989 WL 157722, at *3, 1989 U.S. Dist. LEXIS 14982, at *8 (N.D.Ill. Dec. 14, 1989) (citations omitted); *Swanson v. Village of Lake in the Hills,* No. 87 C 20528, 1988 WL 131541, at *1, 1988 U.S. Dist. LEXIS 13789, at *2 (N.D.Ill. Dec. 1, 1988).

## C. New Rule 11

To the extent new Rule 11 applies, its pertinent core text provides:

(b) **Representations to Court.** By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable op-

portunity for further investigation or discovery....

Among those differences between old Rule 11 and new Rule 11, described in part at page 838 *supra*, there is also the recent abrogation of the duty to withdraw or amend a paper containing a claim, defense or other contention that proves to be baseless. 1 COURT AWARDED ATTORNEY FEES, § 11.05[3]. However, while there may no longer be a duty to withdraw or amend, an attorney still cannot continue to *advocate* a baseless position. *Id.* (emphasis in original).

"The 1993 Rule permits claims, defenses and other legal contentions based on an argument for the establishment of new law; as such, it reflects an intention to tolerate more novel legal theories." *Id.* However, new Rule 11 retains the objective reasonableness standard of old Rule 11. 1 COURT AWARDED ATTORNEY FEES, § 11.05[4][b][i]. As noted earlier, prior to the 1993 amendments, the Rule required a "good-faith" argument; new Rule 11 excuses an attorney whose legal theories, while perhaps not warranted by existing law, are based on a "non-frivolous" argument that existing law should be distinguished, modified or reversed. 1 Court Awarded Attorney Fees, § 11.05[4][b][iii]. The change to non-frivolous "establishes an objective standard, intended to eliminate any 'empty-head pure-heart' justification for potentially frivolous arguments." *Id.* (citing Advisory Committee Note (1993)). Thus, an attorney will not be sanctioned under new Rule 11 if his argument for the extension or modification of existing law is an objectively reasonable one. *Id.*

New Rule 11 also requires that "allegations have evidentiary support." If evidentiary support is lacking, the affected allegation must be specifically identified, with a pleader certifying that evidentiary support will be forthcoming "after reasonable opportunity for further investigation or discovery." 1 COURT AWARDED ATTORNEY FEES § 11.05[b][4][iv]. Thus, new Rule 11 does not require that a paper actually be well grounded in fact, but only that the claims have evidentiary support to the best of the pleaders "knowledge, information and belief formed after an inquiry reasonable under the circumstances."

Additionally, new Rule 11 imposes on counsel an affirmative obligation to conduct a reasonable inquiry into the legal and factual basis of a filing before presenting it. 1 COURT AWARDED ATTORNEY FEES § 11.05[4][c][i].

Finally, new Rule 11 stresses non-monetary sanctions, and it is even clearer now that the purpose of a sanction under Rule 11 is to deter, not to compensate. *Id.*

## D. 28 U.S.C. § 1927

Sanctions have also been sought pursuant to § 1927:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

In *Walter v. Fiorenzo,* 840 F.2d 427, 433 (7th Cir.1988) the Seventh Circuit neatly summarized the standard under § 1927:

A court may impose sanctions under 28 U.S.C. § 1927, against an attorney where that attorney has acted in an objectively unreasonable manner by engaging in a "serious and studied disregard for the orderly process of justice," *Overnite Transportation Co. v. Chicago Industrial Tire Co.,* 697 F.2d 789, 795 (7th Cir.1983) *quoting Kiefel v. Las Vegas Hacienda, Inc.,* 404 F.2d 1163, 1167 (7th Cir.1968) *cert. denied,* 395 U.S. 908, 89 S.Ct. 1750, 23 L.Ed.2d 221 (1969) or where a *"claim [is] without a plausible legal or factual basis and lacking in justification."* Knorr Brake Corp. v. Harbil, Inc., 738 F.2d 223, 227 (7th Cir.1984); *Overnite Transportation Co.,* 697 F.2d at 794–95 (emphasis added). In determining whether an attorney's actions were objectively unreasonable "a court may infer intent from a total lack of factual or legal basis for a suit." *Id.* If a lawyer pursues a path that a reasonably careful attorney would have

known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious. *In Re TCI Ltd.*, 769 F.2d [441] at 445 (7th Cir.1985). Moreover, "assessment of fees under § 1927 may [also] be appropriate in other situations, [involving] improper procedural conduct." *Knorr Brake Corp.*, 738 F.2d at 226 n. 1.

Thus, under § 1927 counsel cannot employ the "ostrich-like tactic of pretending that potentially dispositive authority against a litigant's contention does not exist." *Fred. A. Smith Lumber Co. v. Edidin*, 845 F.2d 750, 753 (7th Cir.1988) (citing *Hill v. Norfolk and Western Ry. Co.*, 814 F.2d 1192, 1198 (7th Cir.1987)).

So, in order for § 1927 sanctions to be imposed, some evidence of subjective or objective bad faith must be shown. *Ross v. City of Waukegan*, 5 F.3d 1084, 1089 n. 6 (7th Cir.1993); *Koffski v. Village of North Barrington*, 988 F.2d 41, 43–44 (7th Cir.1993) (considering § 1927 sanctions in the context of an appeal); *In re TCI, Ltd.*, 769 F.2d at 445 (Bad faith can be demonstrated by subjective evidence of malice, objective evidence of reckless conduct, or indifference to the law.). *See also, Pacific Dunlop Holdings, Inc. v. Barosh*, 22 F.3d 113 (7th Cir.1994).

Therefore, cases in which the Seventh Circuit has upheld § 1927 sanctions have involved situations in which counsel have acted recklessly, counsel raised baseless claims despite notice of the frivolous nature of those claims, or counsel otherwise showed indifference to statutes, rules, or court orders. *Kotsilieris v. Chalmers*, 966 F.2d 1181, 1184–5 (7th Cir.1992). In any event, something more than ordinary negligence must exist in order to justify § 1927 sanctions. *Id.* at 1185. However, since the bad faith standard has an objective component, extremely negligent conduct, like reckless and indifferent conduct, satisfies the § 1927 standard. *Id.*

Therefore, in sum, while the Seventh Circuit has held that subjective bad faith is required, it has also permitted § 1927 sanctions to stand where counsel knew or should have known that a claim or argument was totally without color. 1 M.F. DERFNER, A.D. WOLF, COURT AWARDED ATTORNEY FEES § 10.05. In other words, substantive meritlessness alone creates an automatic inference of improper purpose, even where the improper purpose is not identified. *Id.*

It is also important to contrast the discretionary nature of § 1927 with the mandatory position of Rule 11. Unlike old Rule 11, if the sanction standard has been met under § 1927, a court "may," but need not, award § 1927 fees. *Ross*, 5 F.3d at 1089, n. 6. In addition, unlike old Rule 11, § 1927 has been interpreted in the Seventh Circuit to impose a continuing obligation on attorneys to dismiss claims that are no longer viable. *Dahnke*, 906 F.2d at 1201, n. 6, *citing, Insurance Benefit Adm'rs, Inc. v. Martin*, 871 F.2d 1354, 1360 (7th Cir.1989). Section 1927 also differs from Rule 11 in that it does not require "reasonable" investigation. *Id.* "Section 1927 and Rule 11 are addressed to different conduct: the statute to prolonging litigation and Rule 11 to particular filings." *Samuels v. Wilder*, 906 F.2d 272, 275 (7th Cir.1990). However, the Seventh Circuit has crafted one exception to the rule that § 1927 does not reach the filing of complaints: in the instance when the lawsuit is either factually or legally meritless from the outset, and the attorney should have known that it was. *Overnite Transportation Co. v. Chicago Indus. Tire Co.*, 697 F.2d 789, 794 (7th Cir.1983).

The burden of establishing bad faith is on the fee petitioner. *Textor v. Board of Regents of Northern Illinois Univ.*, 711 F.2d 1387, 1395 (7th Cir.1983) (discussing burden of proof in context of court's inherent power to impose sanctions in bad faith cases). When the § 1927 burden has been met, the attorney who has unreasonably and vexatiously multiplied the proceedings may be required to pay the *excess* costs, expenses and attorney fees incurred because of such conduct. (emphasis added). *Pacific Dunlop Holdings*, 22 F.3d at 120.

## IV. THE ATTORNEYS' ASSERTED DEFENSES

### A. The Rule 11 Motion is not timely

#### 1. Rule 11 and the timeliness requirement

A threshold issue in this case is whether the sanction motion is timely at all. In terms

of Rule 11, the Seventh Circuit has held that, "[I]n all cases, parties must request Rule 11 sanctions 'as soon as practicable after discovery of a Rule 11 violation,' but . . . requests for attorney fees must be filed within ninety days of judgment [or presumably such shorter time as the district's local rule allows]." *Burda v. M. Ecker Co.*, 2 F.3d 769, 774 (7th Cir.1993) (citing *Kaplan v. Zenner*, 956 F.2d 149, 151 (7th Cir.1992)). Thus, the Seventh Circuit has identified the "outer parameters of the timeliness for sanctions claims." *Zenner*, 956 F.2d at 151. At the time that Wabash filed its sanction motion, Local Rule 54.1 imposed a time limit for the filing of any request for the "assessment of attorney fees" as ninety days from the date of the entry of final judgment.[16] Thus, Wabash has at least brought itself within the "outer parameters" of timeliness.

■ However, *Zenner* also provided: "where appropriate such motions should be filed at an earlier time—as soon as practicable after discovery of a Rule 11 violation." 956 F.2d at 151. Thus, the teaching of *Zenner* is that simply relying on the "outer parameters" may not save a sanction claim "if the party bringing it has failed to do so within a reasonable amount of time." *Id.* at 151–2. The concept of temporal "reasonableness" is dictated by the specific facts and circumstances of each given case. *Id.* at 152. However, as the Seventh Circuit recognized in *Zenner*, "[S]eldom should it be necessary to wait for the district court or the court of appeals to rule on the merits of an underlying question of law." *Id.* at 152 (citing *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 99 (3rd Cir.1988)). The reason for the Court's attitude is pure commonsense: if conduct is truly "abusive," it should also be immediately obvious. *Id.*[17]

This prompt filing attitude is consistent with the drafter's view of Rule 11. *Mary Ann Pensiero*, 847 F.2d at 99. The 1983

Advisory Committee Notes recommend that "parties seeking sanctions should give notice to the court and the offending party promptly upon discovering a basis for doing so . . . [.]" The 1993 Advisory Committee Notes contain a similar admonition for new Rule 11:

> Ordinarily the motion should be served promptly after the inappropriate paper is filed, and, if delayed too long, may be viewed as untimely. In other circumstances, it should not be served until the other party has had a reasonable opportunity for discovery. Given the "safe harbor" provisions . . . a party cannot delay serving its Rule 11 motion until conclusion of the case (or judicial rejection of the offending contention).

In sum, "prompt filings of motions for sanctions after discovery of an abuse best serve both the systemic and case-specific deterrent functions of Rule 11." *Zenner*, 956 F.2d at 152.

■ The concept of reasonable promptness is governed by "equitable considerations" that must be resolved on a case by case basis. *Zenner*, 956 F.2d at 152 (citing *In re Kunstler*, 914 F.2d 505, 513 (4th Cir. 1990) *cert. denied* 499 U.S. 969, 111 S.Ct. 1607, 113 L.Ed.2d 669 (1991)). Nonetheless, a party seeking sanctions may avoid timeliness problems "by notifying his opponent *and* the court of his intention to pursue sanctions at the earliest possible date." (emphasis added). *In re Kunstler*, 914 F.2d at 513.

Factually, here, we know that by July 28, 1994, at the latest, Wabash was already aware of many alleged Rule 11 violations— indeed, the very violations that make up the majority of its current Rule 11 motion. Nonetheless, these claims were never brought to the attention of the Court until December 27, 1994, some five months later. No valid excuse is offered for the delay ex-

---

**16.** The Local Rule has since been amended to shorten the time frame to (14) fourteen days. *See* Amended N.D.Ind.L.R. 54.1.

**17.** Of course, waiting until the Court ruled on the merits is precisely what Wabash did—a fact they tried to side-step at oral argument by claiming a desire to do a "thorough job" on the Rule 11 Motion. This overlooks the fact, however, that

they had already identified supposed sanctionable conduct many months earlier. It also blinks at another fundamental point: the initial brief was so inadequate (despite its length) that the undersigned Magistrate Judge had to have them do it over—hardly the hallmark of a thorough brief.

cept the rather lame notion that the district court was exhorting the parties to proceed to trial and that they should not become engaged in some distracting sideshow.[18] However, if Wabash wanted to preserve a sanction claim all it needed to do was file its already prepared sanction motions (thus putting the Court on notice of its intent to pursue sanctions "at the earliest possible date"). *In re Kunstler*, 914 F.2d at 513. Wabash then could have asked the Court to stay any action on the motion until after trial. Certainly, it could not have been the district court's intent to toll the time for the filing of sanction motions (indeed, the court was not even aware of their existence)[19] particularly when the prompt filing of such motions serves both a "systemic and case-specific" function. *Zenner*, 956 F.2d at 152.

■ This view is particularly true as to both the original and amended complaints filed respectively on July 6 and July 30, 1993. Indeed, this case is much like *Zenner*, in that Wabash stoutly maintains that the original and amended complaints both allege facts "legally insufficient to support every element" of the Plaintiffs' claim. *Zenner*, 956 F.2d at 152. In such instances, like *Zenner*, nothing was gained by Wabash's delay, and the extremely late motion (seventeen months after the complaints were filed) cannot be considered as reasonably prompt. *Id.*

Thus, to the extent that Wabash seeks Rule 11 sanctions against the Attorneys for filing both the original complaint, and the amended complaint, their motion is untimely as a matter of law.

Moreover, Wabash knew when it "served" its Rule 11 motion on July 28, 1994, that both

Feltner and Wampler's response to Wabash's Motion for Summary Judgment continued to repeat assertions of *quid pro quo* sexual harassment and retaliatory discharge; nonetheless, the served motion did not incorporate those alleged violations, and it is only now that they seek sanctions for those allegedly bogus claims. *See* exh. 2 to Wabash's reply filed January 27, 1995.[20] Indeed, Wabash waited until almost 60 days after Phelps filed her October 31, 1994, response to Wabash's Motion for Summary Judgment before filing any sanctions motion whatsoever—all despite the fact that Wabash was of the belief that there was no valid basis for a *quid pro quo* sexual harassment claim from the very beginning of the law suit.[21]

■ Overall, the delay exhibited here is inexplicable, and no equitable considerations support a late filing. Indeed, this failure also is fatal to Wabash's claimed Rule 11 violations that hinge on the filed responses to Wabash's motions for summary judgment all of which supposedly contain "misstatements of the law." While these supposed Rule 11 violations were presumably well known to Wabash by July 28, 1994 (at least as to Feltner's and Wampler's response to Wabash's Motions for Summary Judgment, *see* fn. 20, *supra*) no mention was made of them in the served but unfiled Rule 11 motion. When these misstatements supposedly resurfaced in Phelps' later response, no Rule 11 motion was ever served, and the present one was not filed until two months later.

■ The Rule 11 violation alleging misrepresentations by the Attorneys of the deposition testimony of Feltner, Wampler and

---

**18.** Wabash can point to only two examples of the Court's actions. *See* Wabash Reply Brief, p. 6 n. 3. The first example, a November 8, 1994, order of the Court came as the trial was approaching and long after almost all of the alleged sanctionable conduct had already occurred. The other example, an isolated comment in the course of a lengthy hearing, is not the kind of judicial conduct that would ordinarily dissuade motivated counsel from filing a meritorious sanction motion. Indeed, given the attitude of Wabash's counsel, and the way they litigated this case, it is apparent that the desires of the trial Court were no impediment at all.

**19.** At oral argument counsel for Wabash admitted that the district court was unaware of the "served" sanction motions.

**20.** Feltner's response to the Motion for Summary Judgment was filed May 31, 1994, and Wampler's response was filed July 1, 1994—both before the Rule 11 motion was "served" on July 28, 1994.

**21.** Of course, there was only one "served" Rule 11 motion in this case. Thus, allegedly sanctionable events occurring after July 28, 1994, *see, e.g.,* f.n. 8, were never given a "safe harbor" opportunity and cannot form the basis for a Rule 11 motion now. Fed.R.Civ.P. 11(c)(1)(A).

Phelps, and the attaching of conclusory and factually unsupported affidavits (which allegedly contradicted sworn deposition testimony) meet a similar fate. In fact, the allegation that in Feltner's case an altered affidavit was filed by the Attorneys in response to Wabash's Motion for Summary Judgment is another example of delay. Wabash knew that there were problems with the Matthews' affidavit as early as July 28, 1994, *see* exh. 2 to Wabash's reply brief, but never filed a sanction motion about it until December 27, 1994. Thus, this delay too is unreasonable.

■ This leaves the question of whether two motions for reconsideration (i.e., Feltner's October 24, 1994 motion and Wampler's October 31, 1994 motion) asserting supposedly unfounded grounds of *quid pro quo* sexual harassment can be the basis for a timely Rule 11 motion that was filed on December 27, 1994.[22] Of course, one wonders how big an issue this truly is since Wabash never filed a response to either. After all, Wabash seeks in its motion (Wabash Vol I, exh. A) the "excess costs, expenses and attorney fees" they incurred in responding to the Attorneys supposedly groundless contentions, but in this instance the Court promptly denied the motions before Wabash had to do anything. Thus, there can hardly be any "excess" at all. *See* fn. 13, *supra.*

Nonetheless, as expressed in the 1993 Advisory Committee Notes, the purpose of Rule 11 sanctions is "to deter rather than to compensate," and simply because Wabash has nothing to be compensated for is not necessarily controlling.

However, on this record, Wabash's delay in filing a Rule 11 motion as to the motions to reconsider is puzzling. After all, Wabash had been complaining about the Attorneys advancing this theory for months, and certainly could have quickly filed a motion for sanctions as to yet another assertion of *quid*

*pro quo* harassment. Nonetheless, Wabash apparently chose to do nothing (indeed, they never did "serve" a Rule 11 motion—a procedural prerequisite) and did not file their motion until well after the Court had already denied the motions to reconsider.

In fact, Wabash's timing is somewhat suspicious overall. They waited until after December 22, 1994, when both Russell's and Vandeventer's cases were settled before filing the present motion. From this, it looks as if the delay was calculated to provide Wabash with some tactical or strategic advantage.[23] Given the equitable considerations that the Court must consider in determining whether a Rule 11 motion was timely filed, *Zenner,* 956 F.2d at 152, it is apparent that Wabash's efforts fall short.

As a consequence of the foregoing then, it is apparent that to the extent Wabash's motion seeks sanctions under either old Rule 11 or new Rule 11, it has not been timely brought, and it will therefore be the recommendation of the undersigned Magistrate Judge that the Rule 11 portion of the motion be denied.

### 2. *Section 1927 and the timeliness requirement*

■ The timeliness requirements that bedeviled Wabash as to the Rule 11 claim, does not so readily surface to the extent that they seek sanctions under § 1927. After all, *Zenner* was a Rule 11 case from which came the admonition: "prompt filings of motions for sanctions after discovery of an abuse best serve both the systemic and case-specific deterrent functions of Rule 11."

Section 1927, is different, in that it is designed to have those counsel who engage in unreasonable and vexatious conduct, pay the "excess costs, expenses and attorney fees incurred because of such conduct." *Pacific Dunlop Holdings,* 22 F.3d at 120. In most

---

22. As noted, *supra,* Wampler's motion filed November 21, 1994, makes no mention of *quid pro quo* sexual harassment, and is apparently not the target of sanctions given that Wabash has not mentioned it nor made it an exhibit.

23. Counsel for Wabash stoutly challenges such a notion—characterizing the timing as mere happenstance. However, given their past record, it is likely that counsel for Wabash first wanted to safely settle the Vandeventer and Russell hostile sexual environment claims given the possible exposure they presented. Then, having protected its flank, Wabash felt secure about launching a punishing all-out frontal assault on the Attorneys. Vengeance is not only ill-becoming, it is sanctionable in a court of law. Fed.R.Civ.P. 11(b)(1).

such cases, the determination of what are truly excess costs, expenses, and attorney fees cannot be determined until the close of the litigation. In addition, § 1927 has been interpreted to impose a continuing obligation on attorneys to dismiss claims that are no longer viable. *Dahnke*, 906 F.2d at 1201, n. 6. Given this "continuing obligation" it is normally best to wait until the end of the litigation to precisely determine what claims were non-viable as well as when it was that they became non-viable.

As a consequence then, § 1927 is not chained to the same language that foretold the outcome of Wabash's Rule 11 claims; thus Wabash's motion based on the statute can be brought later—indeed, § 1927 has constituted a valid basis for sanctions even after a remand from the Seventh Circuit. *Burda*, 2 F.3d at 777.

As a consequence then, Wabash's motion is timely brought as to § 1927.

**B. The Prior Agreement**

■ The Attorneys note that on September 22, 1994, the Court entered an order requiring counsel to meet to attempt to "resolve all pending discovery disputes and pending motions." As earlier noted, on September 30, 1994, a "Joint Statement" was filed by counsel listing a "resolution of outstanding disputes" and a listing of "pending motions" which could not be resolved. No where was the issue of the served, but unfiled sanctions discussed.

The Attorneys argue that Judge Sharp's order of September 22, 1994, admonished counsel to resolve "pending motions" and that this must have included the sanction motions. However, it is clear that the Court was not aware of any served but unfiled sanction motions when it entered its September 22, 1994 order. *See* fn. 19, *supra.* Moreover, the "Joint Statement" makes no mention of sanction motions which, if truly resolved as contended by the Attorneys, cer-

tainly would have been memorialized in that four-page document. This, no doubt, explains the reading the Court gave to the document. Indeed, the Court viewed its prior order, and the "Joint Statement" as solely addressing "discovery disputes." *See* September 30, 1994 order. Instructively, the Attorneys never challenged the tenor of that order.

At best, the Attorneys argue that there was a unilateral mistake of fact as to what the "Joint Statement" sought to address. However, the "Joint Statement" is clear and unambiguous and does not make any mention of relieving any party or counsel from sanctions. Nor do the Attorneys argue that they were misled by any comments made to them by counsel for Wabash. Rather, the Attorneys rely on the wording of the "Joint Statement"—and that is clearly not enough.

Therefore, having addressed the Attorneys' defenses, the Magistrate Judge will now discuss what remains of Wabash's sanction motion.

## V. THE MERITS OF THE SECTION 1927 MOTION FOR SANCTIONS

**A. The Filing of the Complaint and Amended Complaint, Responding to Wabash's Motions for Summary Judgment, Filing Motions to Reconsider.[24]**

Wabash argues that the Attorneys violated Section 1927 when they filed both a Complaint and an Amended Complaint on behalf of Feltner, Phelps and Wampler that included claims for *quid pro quo* sexual harassment and retaliatory discharge.[25] Essentially, Wabash argues that these respective Plaintiffs, through their own testimony, never had a plausible factual or legal basis for pursuing claims of *quid pro quo* sexual harassment or retaliatory discharge. *See* Wabash's January 27, 1995 reply, p. 10. As a result, Wabash argues that the filing of these pleadings by the Attorneys demonstrates recklessness, in-

---

**24.** The Court has recast Wabash's contentions so as to telescope into this section all of the instances where assertions of *quid pro quo* sexual harassment may have violated § 1927.

**25.** The original Complaint alleged *quid pro quo* sexual harassment only as to Feltner and Phelps, *see* Wabash Vol. I, exh. B; the Amended Complaint alleged *quid pro quo* sexual harassment, but only as to Wampler, *see* Wabash Vol. I, exh. C.

difference to the law, and bad faith. *Id.* Wabash also argues that the pleadings further show that the Attorneys failed to conduct legal and factual research before filing the complaint and that this also demonstrates objective bad faith. *Id.*

The Attorneys respond that they first learned of the potential lawsuit on February 24, 1993, but did not actually file it until July 16, 1993. During the interim, the Attorneys claim that they investigated the charges; researched the law, including EEOC guidelines and court decisions; conferred with other law firms; and interviewed not only the Plaintiffs but other individuals as well. *See* Attorneys' sur-response filed Feb. 6, 1995, p. 10.[26] The Attorneys argue essentially that as to the *quid pro quo* allegations, they should not be sanctioned for merely losing the summary judgment motion, and that in any event, the case of *Harris v. Forklift Systems, Inc.,* — U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) offers a valid legal basis to advance the *quid pro quo* claims. *Id.* at p. 11. As the Attorneys see it, the depositions of Wampler, Feltner and Phelps establish a factual basis for alleging *quid pro quo* sexual harassment.

As to the retaliatory discharge issue, the Attorneys argue there was a sufficient legal and factual basis to support their position and they cite *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 321 (7th Cir.1992) in support. *See* the Attorneys' sur-reply, p. 14. The Attorneys also argue that the case of *McKennon v. Nashville Banner Publishing Co.,* — U.S. ——, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995) demonstrates that the court was in error when it granted summary judgment for Wabash.

In reply, Wabash argues that the chronology of investigation and research provided by the Attorneys (*see* exh. 11 to the Attorneys' sur-response) does not demonstrate what substantive or procedural efforts were undertaken to arrive at a legally defensible legal position, and provides no details as to the

investigation conducted, the law researched, or the individuals interviewed. *See* Wabash's Amended Sur–Reply, p. 6. Wabash also observes that the Attorneys are still at it, because their reliance on *Harris* is misplaced. *Id.* at p. 7. After all, it was the Supreme Court itself that acknowledged that *Harris* was not a *quid pro quo* sexual harassment case. —— U.S. at ——, 114 S.Ct. at 370. As Wabash sees it, the Attorneys have not argued for the extension, modification, or reversal of existing law; rather, the Attorneys "have steadfastly maintained that their opinions about *quid pro quo* sexual harassment *is* the law." (emphasis in original). *Id.* at p. 7.

■ Generally, trial courts are not permitted to award section 1927 fees for the mere filing of a suit. 1 COURT AWARDED ATTORNEY FEES § 10.05 (citing *Matter of Yagman,* 796 F.2d 1165 (9th Cir.1986) (because section 1927 speaks only of "multiplication" of proceedings, an attorney may not be sanctioned under that section for merely filing a law suit)).

However, in the Seventh Circuit, there is one exception to that general rule: when there has been filed and prosecuted a law suit that is meritless and without either a legal or factual basis, and the attorney was, or should have been aware of this fact. *Overnite Transportation Co. v. Chicago Indus. Tire Co.,* 697 F.2d 789, 794 (7th Cir.1983); *Fred A. Smith Lumber Co.,* 845 F.2d at 754 (Counsel generally acted in bad faith by filing a complaint for fraud in the hope that future discovery might uncover the allegations of wrong doing.); *Walter,* 840 F.2d at 435 ("Under section 1927, sanctions for filing a baseless claim properly may be imposed where those claims are not supported by the facts.").

In order to assess the basis for section 1927 sanctions, the Court will address the *quid pro quo* sexual harassment claims separately from the retaliation claims.

---

**26.** The Attorneys have a June 21, 1993, letter from attorney Maly of the law firm of Gallucci, Hopkins & Theisen, P.C., that indicates that that firm "would be interested in pursuing this matter, possibly by filing a class action suit in which we would allege a hostile work environment."

The law firm of Gallucci, Hopkins & Theisen is an experienced employment law litigation firm in Fort Wayne. Noticeable by its absence, however, is any suggestion that they would bring a *quid pro quo* sexual harassment claim on behalf of the Plaintiffs.

### 1. *Quid pro quo sexual harassment*

 Wampler, Feltner and Phelps all claimed in their pleadings that they had been the victims of "classic" *quid pro quo* sexual harassment. However, after Wabash filed Motions for Summary Judgment on this and other issues, the nakedness of these claims became apparent. Undeterred by what they must have viewed as a minor point, the Attorneys continued to relentlessly argue that the theory of *quid pro quo* sexual harassment applied—doggedly pursuing it even after the Court educated them by ruling on the motions for summary judgment.

For example, in Phelp's response to Wabash's Motion for Summary Judgment the Attorneys simply refer to exh. B (Phelps' affidavit) for support. *See* Wabash Vol II, exh. G. However, a review of the affidavit discloses no evidence, or even a discussion of, *quid pro quo* sexual harassment.[27] Nonetheless, the Attorneys argued, citing the Seventh Circuit's decision in *Dockter v. Rudolf Wolff Futures, Inc.*, 913 F.2d 456 (7th Cir. 1990), that Phelps had made out such a claim because her supervisors, and management, had all made sexual advances towards her. *See* Wabash Vol. II, exh. G p. 14. While *Dockter* might stand for that proposition, the record does not support the allegation that sexual advances were ever made towards Phelps, or that the supervisors made her submission to sexual advances a term and condition of employment. In short, this argument was more in the nature of unsupported wishful thinking.

In another example of wildly over-stating a case, Wampler also continued to claim *quid pro quo* sexual harassment in her response to Wabash's Motion for Summary Judgment. *See* Wabash Vol. II, exh. H p. 2. However, a review of Wampler's affidavit in opposition to the motion reveals no evidence that could even remotely be considered as *quid pro quo* sexual harassment. *See* Wabash Vol. II, exh. 1 to exh. H. Devoid of facts, the Attorneys nonetheless continued to argue a *quid pro quo* sexual harassment claim for Wampler. *See* Wabash Vol II, exh. H pp. 20–21. Clearly, if the Attorneys ever thought Wampler

had a *quid pro quo* sexual harassment claim, by the time the Motion for Summary Judgment was filed, those thoughts should have vanished. *Id.* Unfortunately, the Attorneys continued to turn a blind eye to reality.

Feltner's claim was no better. Indeed, it revealed that the Attorneys were hopelessly confused as to what *quid pro quo* sexual harassment truly meant: continually confusing it with what constitutes a hostile sexual environment. *See* Wabash Vol II, exh. I p. 19. No where does the record reflect a true *quid pro quo* sexual harassment claim for Feltner. *See e.g.*, Wabash Vol. II, exh. 4 to exh. I.

On October 17, 1994, the Court granted summary judgment against Feltner on his *quid pro quo* sexual harassment claim; and on October 27, 1994, summary judgment was granted against Wampler on her *quid pro quo* sexual harassment claim. *See* Wabash's Exhs. vol. 3, exhs. K; L. On November 18, 1994, the Court entered a Memorandum and Order granting summary judgment to Wabash on Phelps *quid pro quo* sexual harassment claim. *See* Wabash Exhs. vol. 3, exh. J. In each instance, the Court held that there had been a misapprehension by the Attorneys of the legal meaning of *quid pro quo* sexual harassment and that they had no facts to support their claims.

In fact, the Court succinctly summarized the theory as follows:

> The seminal case in the Seventh Circuit is *Dockter v. Rudolf Wolff Futures, Inc.*, 913 F.2d 456 (7th Cir.1990), which defined *quid pro quo* sexual harassment as "situations in which submission to sexual demands is made a condition of tangible employment benefits." *Id.* at 461 (emphasis added) (citing *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1413 (10th Cir.1987)); *see also* 29 C.F.R. § 1604.11(a). Employers engage in *quid pro quo* sexual harassment when they condition employment benefits on the granting of sexual favors or on submission to sexual advances. *Piech v. Arthur Andersen & Co.*, 841 F.Supp. 825, 830 n. 5 (N.D.Ill.1994); *see also Spencer v.*

---

**27.** While Phelps affidavit catalogued many grievances against Wabash in rather overheated prose, none of them supported a cognizable claim against Wabash.

General Electric Co., 706 F.Supp. 1234, 1237 (E.D.Va.1989), aff'd 894 F.2d 651 (4th Cir.1990). There is no quid pro quo harassment when no one at the place of business links economic benefits to the plaintiff's participation in sexual conduct. See Dey v. Colt Construction, 28 F.3d [1446] at 1453 [ (7th Cir.1994) ].

Vandeventer v. Wabash Nat'l Corp., 867 F.Supp. 790, 797 (N.D.Ind.1994).

Incredibly, the Attorneys, on behalf of both Wampler and Feltner responded by filing Motions to Reconsider the Court's ruling on the quid pro quo sexual harassment claims. The motions, however, argued nothing new and the Court promptly denied them.

In responding to the sanction motion, the Attorneys now somewhat tortuously argue that Harris, even though a hostile work environment case, not only espoused a legal principle which extends to quid pro quo situations, but that Harris now supersedes all of those prior quid pro quo cases cited not only by Wabash, but also presumably the Court. See the Attorneys sur-response p. 11. The Attorneys' argument is largely incomprehensible and certainly belated; they never argued Harris in responding to Wabash's Motions for Summary Judgment on the quid pro quo harassment claims—they only argued it as to the hostile environment claims.

Moreover, the fundamental problem with the Attorneys' argument is that it is simply wrong. First, the Attorneys could not have relied on Harris (as the basis for altering prior law on quid pro quo sexual harassment) when they filed the original and amended complaints, because Harris came down months later.[28] Second, Harris is simply not a quid pro quo sexual harassment case. —— U.S. at ——, 114 S.Ct. at 370 ("No quid pro quo harassment issue is present here."). Indeed, even after Harris, the Seventh Circuit has continued to reiterate its pre-Harris standard for quid pro quo harassment. See Dey v. Colt Construction, 28 F.3d 1446, 1453 (7th Cir.1994) (citing Dockter, 913 F.2d at 461 ("Dey does not advance a quid pro quo harassment theory, as she admits that no one at Colt linked an economic benefit to her participation in conduct of a sexual nature.").

Thus, given the proper standard, the district court had no choice but to declare that none of the Plaintiffs had a factual basis to assert quid pro quo sexual harassment.

Particularly troubling in all this is the fact that the Attorneys on behalf of Phelps filed a response to Wabash's motions for summary on October 31, 1994, (after the Court had already ruled against them in both Feltner's and Wampler's cases) continuing to argue that Phelps had a quid pro quo sexual harassment claim.[29] See Wabash Exhs. vol. 2, exh. G pp. 13–14. While the Attorneys now unconvincingly argue that Harris somehow changed the law as to quid pro quo sexual harassment, they overlook Dey, a case decided well before their response in Phelps.[30] Thus, the Attorneys should have known that the Seventh Circuit continued to view Dockter (a pre-Harris case) as controlling and unaltered precedent—a result that makes the Attorneys' newly-found argument worthless even on their own terms.

Thus, on this record it is clear that from the very beginning, when both the original and amended complaints were filed, there was no legal or factual basis for making a quid pro quo sexual harassment claim, and the Attorneys should have been aware of this fact. Overnite Transportation Co., 697 F.2d at 794. Indeed, while a complaint need not set forth detailed facts upon which a claim is based, Fed.R.Civ.P. 8(a), (e), neither the complaint nor the amended complaint make out any allegations that even remotely come close to "a classic example of ... 'quid pro quo harassment....'" See Wabash Exhs. Vol. 1, exh. B p. 15; Exh. C p. 4. Later,

---

28. The original Complaint was filed on July 6, and the Amended Complaint was filed on July 30, 1993. Harris was decided on November 9, 1993.

29. Of course, as noted supra, Phelps did not have a quid pro quo sexual harassment case either factually or legally.

30. Dey was decided July 11, 1994; a petition for rehearing and suggestion for rehearing en banc was denied August 26, 1994. The Attorneys filed Phelp's response on October 31, 1994.

after discovery, and after responding to the various motions for summary judgment, it is clear that if there was any "classic" case here at all, it is one of over-pleading. This is substantiated by the fact that the Attorneys still cannot point to any facts that support a *quid pro quo* sexual harassment claim as to even one of the Plaintiffs—thus giving rise to the rather powerful, unrebutted inference that one never existed.[31] Moreover, their efforts at showing the Court a reasonable investigation, both factually and legally, while perhaps sufficient as to some theories, was clearly insufficient in this area; indeed, the Attorneys have pointed to no other law firm or lawyer that ever suggested that *quid pro quo* sexual harassment was present here. *See* f.n. 26, *supra.*

All that is left is the Attorneys' "opinion" that through some sort of legal alchemy, *Harris* turned the "facts" present here into a *quid pro quo* sexual harassment claim. *See* Attorneys' sur-response, p. 11. As previously discussed, this process yields no gold, only dross.[32] In sum, the Attorneys were essentially ostriches who turned a blind eye to the law when they had no facts to support their claim—a blindness that persisted throughout. On such a record, bad faith has been shown; indeed, it is inescapable. *Walter,* 840 F.2d at 433. Thus, the Attorneys violated section 1927 when they filed both the complaint and the amended complaint alleging *quid pro quo* sexual harassment, given that any reasonable attorney would have recognized that there was no legal or factual basis for such a claim. *Overnite Transportation Co.,* 697 F.2d at 794. The Attorneys then compounded the violation by continuing to argue it through the various summary judgment motions and on two motion to reconsider. Thus, at least as to this untenable claim, the Attorneys unreasonably and vexatiously multiplied these proceedings in bad faith. *In re TCI Limited,* 769 F.2d at 443–4 ("[a]rguing the same claims after repeated rejections is not creative. It is harassing, frivolous and in bad faith.")

### 2. The retaliation claims

■ Wampler, Feltner and Phelps all claimed in their pleadings that they had been retaliated against by Wabash. Feltner claimed that he had been retaliated against for complaining about sexual harassment on the job. Wabash Vol. 1, exh. B p. 12. Phelps claimed retaliation because she complained about both sexual harassment and racial discrimination. *See* Wabash Vol. I., exh. B pp. 17–18, 20–22. The Amended Complaint contained Wampler's claim that she had been retaliated against because she complained about sexual harassment. Wabash Vol. I, exh. C pp. 6–7.

■ However, as discussed *supra,* unlike the *quid pro quo* counts, Wabash did not claim a Rule 11 violation as to these retaliation claims, rather, it simply proceeded to file a motion for summary judgment on each. In its motions, Wabash correctly noted that a *prima facie* case of retaliation must show that: (1) the plaintiff engaged in statutorily protected expression; (2) the plaintiff suffered an adverse action by the plaintiff's employer; and (3) there is a causal link between the protected expression and the adverse action, *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 321 (7th Cir.1992). Wabash argued that all three retaliation cases fell short. *See* Wabash Vol. I, exh. D (as to Phelps) pp. 21–22; Wabash Vol. II, exh. E (as to Wampler) pp. 23–24; Wabash Vol. II, exh. F (as to Feltner) pp. 10–11. Essentially, Wabash argued that Phelps was not terminated because of retaliation, but because she had violated Wabash's drug abuse policy. *Id.* As to Wampler, Wabash argued that she simply had no facts to support her claim. *Id.* Finally, Wabash argued that Feltner was not terminated in retaliation for his complaint of sexual harass-

---

**31.** In oral argument on May 18, 1995, counsel for the Attorneys quoted from the Wampler deposition, pages 19–22, and then hatched a new theory of *quid pro quo* sexual harassment—that Wampler was forced to remain silent about the sexual hijinks of her "coordinator" just to keep her job. This new slant on *quid pro quo* sexual harassment, an implied "your silence or your job," was never argued by the Attorneys, perhaps with good reason, the passage from Wampler's deposition does not support it. *Id.*

**32.** At oral argument on May 18, 1995, even able counsel for the Attorneys was hard-pressed to find any merit to such a position.

ment but because he violated Wabash's leave of absence policy. *Id.*

As to Phelps claim, the Attorneys superficially responded that she had facts to support her claim. *See* Wabash Vol. II, exh. G pp. 18–19.

As to Wampler's claim of retaliation, the Attorneys pointed to a single exchange during Wampler's deposition that supposedly supported a claim for retaliation. *See* Wabash Vol. II, exh. H pp. 22–3. As Wampler testified:

A. I just mean that, whether I meant to, I felt, I said, I had gone to the top and I felt like nothing was ever going to change at Wabash. I felt like I was going to put up with this as long as I stayed there.

Q. OK, and that's what you mean by retaliation?

A. Yes.

Wampler dep., p. 97 lines 11–22.

Finally, the Attorneys argued in Feltner's case that they had met the *Juarez* criteria because Feltner complained about sexual harassment, was fired, and that the causal link was the temporal circumstance: Feltner was terminated within two weeks of his last complaint. *See* Wabash Vol. II, exh. I pp. 19–20.

In ruling on the various motions for summary judgment, the Court applied the standard set forth in *Juarez*. However, the Court held that Phelps failed to meet the standard because, even assuming *arguendo* that she had made out a *prima facie* case, she failed to rebut the non-discriminatory legitimate reason for the discharge, i.e., that she had failed a random drug test. Wabash Vol. III, exh. J pp. 10–12. Since Wabash had a legitimate non-discriminatory policy of firing employees who flunked drug tests, and since Phelps had put forth no evidence to show that the proffered reason for her discharge was pretextual, the Court granted summary judgment. Indeed, at the same time that Phelps was discharged, a white male co-worker was also fired for testing positive. *Id.*

As to Wampler, the Court held that since she quit her employment at Wabash, and was not fired, her claim of "retaliation" was really a claim for constructive discharge given that she was essentially claiming that the sexual harassment affected her to such a degree that she was forced to quit. Wabash Vol. III, exh. L pp. 5–7. The Court observed that there was no active retaliation against Wampler since her sole complaint was that Wabash failed to act on her complaints of harassment. *Id.* Thus, the Court viewed Wampler's claim against Wabash as really being in the nature of a "sin of omission"; in other words, part of Wampler's hostile environment claim (i.e., the sexual harassment claim) and not a separate cognizable claim for retaliation. *Id.*

Finally, the Court granted summary judgment on Feltner's case. Wabash Vol. III, exh. K pp. 12–13. In short, the Court held that Feltner failed to state a *prima facie* case because he failed to produce any evidence of a link between his complaints and the decision to terminate him, and that at any rate, his termination had been decided by people to whom he had not complained. *Id.* Moreover, the Court held that Feltner had failed to show that his termination, arising out of his violation of Wabash's leave of absence policy, was in any way pretextual.

■ On this record, Wabash has failed in its burden to show that when the Complaint and Amended Complaint were filed there was no legal or factual basis for the making of any of these retaliation claims. *Overnite Transportation Co.*, 697 F.2d at 794. Clearly, at the pleading stage, and based upon what the Attorneys would reasonably have known about the facts of each case, a claim for retaliation at least held out some promise. Indeed, each of the Plaintiffs had engaged in statutorily-protected expression, and at least Feltner and Phelps had suffered an adverse employment action by Wabash. Moreover, given the temporal circumstances, there was arguably a causal link between the protected expressions and the adverse actions. After all, a short time period in-between may give rise to an inference that the action taken was retaliatory; of course, evidence of proximity cannot be considered in the abstract, rather it must be viewed in the context of the facts

and circumstances of each particular case. *Hamann v. Gates Chevrolet, Inc.,* 910 F.2d 1417, 1420 (7th Cir.1990); *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1314 (6th Cir.1989); *Kimbro v. Atlantic Richfield Co.,* 889 F.2d 869, 881 (9th Cir. 1989) *cert. denied,* 498 U.S. 814, 111 S.Ct. 53, 112 L.Ed.2d 28 (1990). Thus, the Attorneys, at least at the pleading stage, had an inference that retaliation was at work.

As to Wampler, while the Court ultimately chose to view her retaliation claim as really being one of constructive discharge, the Attorneys rather creatively (albeit, superficially) argued that an employer who takes no action on an employee's sexual harassment complaint, such that the harassment is allowed to continue, is really engaging in an adverse employment action and retaliation. "[R]etaliatory conduct that results in intolerable working conditions may also constitute constructive discharge." 1 L. LARSON, EMPLOYMENT DISCRIMINATION § 15.07, 15–50. *See also,* 2 EMPLOYMENT DISCRIMINATION, 34.04. Indeed, an employer's toleration of harassment by fellow employees has been perceived as retaliatory. 2 *Employment Discrimination* § 34.04, pp. 34–59. Thus, at the very least, Wampler's claim presented a good faith argument for an extension of the law, and could hardly be considered as being advanced in bad faith. At worst, Wampler's claim failed because of a lack of evidence—not, however, because there was no factual or legal basis to support it. Thus, bad faith has not been shown.

Of course, the remaining question becomes: Did any of the retaliation claims ever become so non-viable that they should have been dismissed? *Dahnke,* 906 F.2d at 1201 n. 6. On this record, only Feltner's and Phelp's claims arguably worsened to the point that they became substantively meritless. While they present a close case for § 1927 sanctions, they were never so hopeless that they truly amounted to bad faith. Of course, even if they did ultimately shrivel to such a point that a finding of bad faith is warranted, the recommendation regarding what would be an appropriate sanction, *infra,* would remain unaltered. Indeed, like the *quid pro quo* claims, Feltner's and Wam-

pler's retaliation claims were more like pesky gnats—and could have just as easily been shooed away. As a consequence then, it will be the recommendation of the undersigned Magistrate Judge that no sanctions be imposed for pleading or advancing any of the retaliation claims.

**B. The Filing of Summary Judgment Responses Containing Alleged Misstatements of Law.**

### 1. The Feltner Summary Judgment Response

■ Wabash argues, citing *Kapco Mfg. Co. v. C & O Enterprises,* 886 F.2d 1485, 1491 (7th Cir.1989) that the Attorneys violated § 1927 when they argued in response to Wabash's motion for summary judgment that Wabash was precluded under the Doctrine of *Res Judicata* from arguing that Feltner was fired because he violated Wabash's leave of absence policy. *See* Wabash's January 27, 1995 reply brief, pp. 13–15, 16.

Essentially, the Attorneys argued that because a state unemployment hearing officer found that Feltner was not terminated for just cause (thereby awarding him unemployment compensation benefits) Wabash was thereby precluded from arguing that Feltner had been terminated for violating Wabash's leave of absence policy. *See* Wabash Vol. II, Exh. I, pp. 11–13. Indeed, the hearing officer actually went further; he determined that Feltner had not in fact violated the leave policy. *See* Wabash Vol. II, Exh. 26 to Exh. I. As the hearing officer saw it, if Feltner ever violated the leave policy he did so unknowingly, and that in any event, Wabash's policy had not been uniformly enforced or even clearly written. *Id.* Thus, the Attorneys argued that the hearing officer's decision should "be given full force of faith and credit" *citing Buckhalter v. Pepsi Cola,* 820 F.2d 892 (7th Cir.1987); *Reed v. AMAX Coal Co.,* 971 F.2d 1295 (7th Cir.1992) and *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). *See Wabash Vol. II, exh. I, pp. 11–13.*

Long after Feltner's Attorneys made this response to Wabash's motion the Court held in Vandeventer's case that *res judicata* did not apply to such an unreviewed agency deci-

sion.[33] *See* Wabash Vol. III, Exh. P, p. 6. In a footnote to the Vandeventer decision, the Court warned the Attorneys that they "had better take a good, hard look at *Buckhalter v. Pepsi Cola*, 820 F.2d 892 ([7th Cir.1987)]; *Reed v. AMAX Coal Co.*, 971 F.2d 1295 (7th Cir.1992); and *University of Tennessee v. Elliott*, 478 U.S. 788 [106 S.Ct. 3220, 92 L.Ed.2d 635] (1986) before citing them again in this Court in a *Title VII* case." (emphasis in original).

Nothing, if not persistent, the Attorneys on October 24, 1994, filed a motion to reconsider the granting of summary judgment against Feltner on the retaliation count, but in so doing they changed their argument by stating: "there are indeed numerous facts placed in dispute as to why [Feltner] was terminated, i.e., his statements versus defendant's statements and the findings of an administrative law judge (although possibly not binding on this Court, at least raises numerous issues of fact which must be tried)." *See* Wabash Vol. III, Exh. N, p. 4.

Of course, the preclusive effect of state judicial or administrative proceedings on subsequent federal court action is governed by 28 U.S.C. § 1738, which extends to federal courts the principles embodied in the "Full Faith and Credit" clause of the United States Constitution. However, when that statute is applied to unreviewed administrative proceedings that are subsequently raised in a Title VII action, the United States Supreme Court has offered guidance.

In the *University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), a black university employee threatened with discharge received an administrative hearing under state law and the hearing officer ("ALJ") found that the University's charges were not motivated by racial animosity. Having already filed a federal action under Title VII and 42 U.S.C. § 1983, the employee did not seek further review of the administrative decision in the Tennessee

state courts; rather, he simply chose to pursue his federal claims.

In the federal courts the University argued that the ALJ's finding precluded the employee's claims under both Title VII and § 1983. While the United States Supreme Court held that unreviewed administrative fact-finding should be given preclusive effect in subsequent § 1983 actions, it reached a different conclusion in regard to Title VII. 478 U.S. at 797–99, 106 S.Ct. at 3225–6. As the Supreme Court saw it:

> On the basis of our analysis ... of the language and legislative history of Title VII, we conclude that ... Congress did not intend unreviewed state administrative proceeding to have preclusive effect on Title VII claims.

478 U.S. at 796, 106 S.Ct. at 3225.

"Following *Elliott*, the courts of appeals have unanimously concluded that unreviewed administrative agency findings can never be accorded issue preclusive effect in subsequent Title VII proceedings." *Roth v. Koppers Indus., Inc.*, 993 F.2d 1058, 1062 (3rd Cir.1993).[34]

However, all of the cases addressed by the court of appeals at least until 1993, when the complaint was filed, dealt with the defending employer attempting to utilize a prior state administrative determination that was adverse to the Title VII plaintiff.

Still very much at issue, on the other hand, was the question of whether the *Elliott* decision barred an *offensive* use of collateral estoppel in a Title VII action brought by an employee who had previously filed a successful claim for unemployment compensation benefits. By 1993, only a few district courts had reviewed that precise issue, and they had all held that *Elliott* bars such an offensive use of collateral estoppel; nonetheless, the circuit courts had yet to consider the point. *Roth*, 993 F.2d at 1062.

In *Roth*, the question finally reached the Third Circuit, and that court indicated that

---

**33.** While Feltner's response was filed May 31, 1994, the Vandeventer order was entered on October 12, 1994. Shortly thereafter, on October 17, 1994, the Court granted summary judgment to Wabash on Feltner's claims.

**34.** Of course, the whole reason why the administrative finding here was "unreviewed" was because the unsuccessful party, Wabash, chose not to appeal it further.

*Elliott* applies equally to a Title VII plaintiff attempting to assert collateral estoppel on the basis of a favorable finding of fact in an unreviewed state administrative proceeding. *Id.* While the Seventh Circuit had previously held that unreviewed administrative determinations lack preclusive effect in Title VII actions, *Duggan v. Board of Educ.,* 818 F.2d 1291, 1293 (7th Cir.1987), it still has never addressed the issue decided in *Roth.*

Thus, while the Attorneys argument for the offensive use of collateral estoppel was weak, and while they relied on the wrong cases in support of their theory, it can hardly be said that making the argument was vexatious or unreasonable. Indeed, the Third Circuit apparently did not find the argument to be sanctionable in *Roth,* and the question remains open in this Circuit. Section 1927 should not be used as a bludgeon to punish attorneys who have advanced good faith arguments—even if those arguments were not well advanced. Accordingly, it will be the recommendation of the undersigned Magistrate Judge that no sanctions be imposed on this issue.

### 2. The Wampler and Phelps Summary Judgment responses

■ As to Wampler and Phelps, Wabash seems to argue that the Attorneys misrepresented legal authority because their responses cited only the same cases Wabash cited, but then failed to come to the same legal conclusion that Wabash did. *See* Wabash's January 27, 1995 reply, p. 14. While Wabash is understandably critical about the quality of the Attorneys' work in responding to the Motion for Summary Judgment, and while the arguments of the Attorneys were poorly presented, the undersigned Magistrate Judge is hard-pressed to say that the Attorneys presented a "misrepresentation of legal authority" to the Court. While Wabash isolates on the Attorneys apparent misquoting of the Supreme Court in *Meritor Saving Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) the misquotation does not actually change the Supreme Court's meaning. Thus, what we have here is an example of poor legal draftsmanship and scholarship, but not subjective or objective bad faith under § 1927. This is

a far cry from the § 1927 sanctionable scullduggery and litigation "war" that the Seventh Circuit described in *Kapco,* and upon which Wabash relies. *See* 886 F.2d at 1492.

As a consequence then, it will be the recommendation of the undersigned Magistrate Judge that no § 1927 sanctions be imposed based these responses to Wabash's Motion for Summary Judgment.

### C. The Making of Alleged Misrepresentations of the Deposition Testimony of Feltner, Wampler and Phelps and the Use of Conclusory and Contradictory Affidavits Lacking Factual Support.

■ On this issue, Wabash claims that the Attorneys mispresented Feltner's, Wampler's and Phelp's deposition testimony in responding to Wabash's Motion for Summary Judgment and in the affidavits of the respective Plaintiffs.

For example, Feltner apparently testified at his deposition that he knew that Wabash had a policy against sexual harassment, that he understood it, and that the policy was posted. *See* Feltner dep. excerpts, Exh. 2 to Wabash's Motion for Summary Judgment, Wabash Vol. II, Exh. F. Nonetheless, in responding to Wabash's Motion for Summary Judgment, the Attorneys submitted an affidavit from Feltner wherein he claimed that the sexual harassment policy at Wabash was never mentioned at orientation and was never visibly posted. *See* Exh. 4 of Feltner's response, Wabash Vol. II, Exh. I. The Attorneys then argued in their response to the Motion for Summary Judgment what Feltner said in his affidavit, as if the deposition never existed. *See* Wabash Vol. II, Exh. I, p. 6. Of course, in fairness, it should be noted that other witnesses, other than Feltner, also testified by affidavit that Wabash's policy was not visibly posted and was not mentioned or discussed at orientation. *See* Wabash Vol. II, Exh. I, exhs. 5–10.

As to Wampler, Wabash contends that Wampler also submitted an affidavit that conflicts with her sworn deposition testimony. In essence, Wampler's affidavit states that she was led to believe while she was at Wabash that she had no right to complain

about sexual harassment as a "part-time permanent workers...." *See* Wabash Vol. II, Exh. H, exh. 1. However, Wabash contends that this cannot be true because Wampler in fact complained about a co-worker who she suspected of using drugs, but at the same time she never complained about instances of alleged sexual harassment. *See* Wabash Vol. IV, Exh. S, exh. 5 & 6.

Wabash also alleges that the Attorneys misrepresented Phelps' deposition testimony in their response brief to Wabash's Motion for Summary Judgment by stating that Phelps "told the truth on her application for employment," Wabash Vol. II, exh. G, p. 19 (when, in fact, she allegedly admitted in her deposition that she had not); and when they said that Phelps also testified in her deposition that she had "left under mutual agreement from two of her previous jobs," *id.*, (when her deposition testimony supposedly indicated otherwise). *See* Wabash Vol. IV, T exh. 20. Apparently this argument stems, at least in part, from the fact that Phelps stated in her affidavit, submitted along with her response to the Motion for Summary Judgment, that she had not in fact been terminated and had left one job under mutual agreement. *See* Wabash Vol. II, exh. B to Exh. G, ¶¶ 19, 21.

As to all of these allegations, the Attorneys argue that they should not be punished simply because their witnesses changed their minds, or made inconsistent statements, or because upon further reflection they made statements that were at odds with what they had previously said in their depositions. In short, they argue that no bad faith by them has been shown. *See* Attorneys' sur-response filed February 6, 1995, p. 19.[35]

In reply, Wabash argues that the Attorneys have missed the point: Wabash is claiming that the Attorneys submitted affidavits and made statements in responding to the Motion for Summary Judgment that were groundless. *See* Wabash sur-reply p.

14. Wabash claims that the act of foisting factual misrepresentations upon the Court merits sanctions under § 1927.[36]

Neither counsel, nor the Court, could find a case that directly addressed the filing of affidavits that contradict prior deposition testimony within the meaning of § 1927. Nonetheless, some general principles can be applied, and they will yield the answer to this issue.

As earlier noted, the burden is on Wabash to establish bad faith. *Textor*, 711 F.2d at 1395. In this instance, the Attorneys have alleged that the party witnesses recalled things differently after testifying in their depositions, and that they then set those things out in later affidavits. As almost any trial judge knows, this is not an infrequent circumstance on summary judgment. Indeed, long ago, the Seventh Circuit provided guidance as to such contradictory affidavits. *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir.1985); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1315 (7th Cir. 1989); *Darnell v. Target Stores*, 16 F.3d 174 (7th Cir.1994); *Essick v. Yellow Freight Systems, Inc.*, 965 F.2d 334 (7th Cir.1992).

At any rate, prior to the May 18, 1995 hearing, both sides were given an opportunity to present evidence on this issue and both sides waived. Without hearing evidence on the matter and without being given an opportunity to assess the demeanor and credibility of the witnesses (e.g., the Attorneys, the affiants) the motion must fail for lack of evidence. In essence, what has been presented demonstrates a question of fact, and since the record is now in equipoise, the fee petitioner has failed to carry its burden of proof. As a consequence, it will be the recommendation of the undersigned Magistrate Judge that no sanctions be imposed on this issue.

---

35. The Attorneys also seemingly argue that Wabash filed a motion to strike those affidavits in August 1994, and since no sanctions were sought at that time, Wabash should be precluded from receiving them now. *Id.* However, the timeliness issue, while pertinent to Rule 11, has no applicability to § 1927. *See pp. 30-1, supra.*

36. Notably, Wabash never sought sanctions against the individual Plaintiffs for filing bad faith affidavits under Fed.R.Civ.P. 56(g).

### D. The Presentation of an Altered Affidavit

■ Wabash claims that the Attorneys obtained an affidavit from witness Matthews which was then used to respond to Wabash's Motion for Summary Judgment against Vandeventer. The introductory paragraph of that affidavit stated "I, the undersigned, do hereby affirm, swear, and state under oath: . . . ." Wabash exh. Vol. IV, exh. U, exh. 22. In reply to Vandeventer's response, Wabash indicated that the Matthews' affidavit (as well as some other affidavits submitted by the Attorneys) failed to allege that they were based on "personal knowledge." Later, the Attorneys in responding to Wabash's Motion for Summary Judgment against Feltner submitted another Matthews' affidavit but this one contained an introductory paragraph that purported to be made on "personal knowledge." Wabash Vol. IV, exh. 2, exh. 23.

However, a close reading of the two affidavits indicates that the signature and notary blocks on the second page of each are identical. In short, the first page was apparently retyped at some point so as to include the "personal knowledge" language, and then the signature and notary page from the first affidavit was attached. The result produced essentially two somewhat different affidavits, each bearing the same signature and notary page, and each were filed.

Matthews' deposition was thereafter taken, and she testified that she can remember signing only one affidavit—the first one, filed in support of the response to Wabash's Motion for Summary Judgment against Vandeventer. See Matthews' dep., pp. 31–35; attached as exh. 3 to Wabash's Amended Sur–Reply. Matthews does not recall signing the second affidavit which included the "personal knowledge" language. Id. See also, Matthews dep. pp. 51–2.

The Attorneys argue that Matthews actually testified that she cannot recall how many copies of the affidavit she signed, see Matthews dep. p. 51, and that in any event, the notary has submitted an affidavit verifying that the second "personal knowledge" affida-vit was in fact signed by Matthews. See Attorneys Sur–Response, exh. 19. As a final retort, the Attorneys seem to indicate that Matthews has simply contradicted herself—a fact not unique to witnesses on either side.

Wabash argues that the act of submitting or causing to be submitted an affidavit to the Court in which the first page of a witness' affidavit has been replaced with a different first page alters the document. Although Wabash acknowledges that there is no Seventh Circuit authority for sanctioning attorneys who submit altered affidavits to the court, they maintain that the conduct of the Attorneys in doing so was unreasonable and vexatious. See Wabash's January 27, 1995 reply, pp. 22–3.

This issue presents a factual issue to the Court that is not easily resolvable. Of course, it is possible that the submission of the affidavit in Feltner's case was the one that was in fact signed or authorized by Matthews, and not the affidavit submitted in the Vandeventer case.[37] In any event, given the issues at work here, the Court cannot say that the Attorneys exercised bad faith. After all, the facts surrounding the submission of these two affidavits is far from clear, and indeed, there appears to be a dispute between Matthews and the notary as to precisely how the documents were signed. Given the lack of evidence, and the burden on Wabash, *Textor,* 711 F.2d at 1395, it will be recommendation of the undersigned Magistrate Judge that no sanctions be imposed on this issue.

## VI. A FEW WORDS ABOUT RULE 11

Although the Rule 11 motion was in general untimely; and on many points failed to procedurally afford a "safe harbor" opportunity to the Attorneys (i.e., the retaliatory discharge claim, the repeating of the *quid pro quo* sexual harassment claim in the response to Wabash's Motion for Summary Judgment and in the Motions to Reconsider) if it had proceeded to the merits it would have failed on at least a few other points as well. For example, the Attorneys' responses to Wabash's Motions for Summary Judgment, were not objectively unreasonable in

---

**37.** No sanctions were sought in the Vandeventer case.

their arguments—particularly as to Feltner's claim for the offensive use of collateral estoppel. Thus, even if the undersigned Magistrate Judge had proceeded to the merits on the Rule 11 motion, it is unlikely that the sanctions hereafter recommended under § 1927 would be materially different.

## VII. THE QUESTION OF SANCTIONS

 Whether to impose a sanction, and the form of that sanction, is a matter to be determined within the discretion of the district court. *Kotsilieris*, 966 F.2d at 1183, 1187. Section 1927, like Rule 11, gives the district court discretion to "impose a penalty as light as a censure and as heavy as is justified ... [.]" *Kotsilieris*, 966 F.2d at 1187–8 (citing *Frantz v. United States Powerlifting Federation*, 836 F.2d 1063, 1066 (7th Cir.1987)). In that regard, and particularly as to fee awards, equitable factors should be considered. *Brown*, 830 F.2d at 1439.

 Ordinarily, under § 1927, sanctions may be assessed against an attorney only for the "excess costs, expenses, and attorney fees" reasonably incurred by the other side because of that attorney's unreasonable and vexatious conduct in multiplying the proceedings. However, as discussed *supra*, Wabash has only prevailed in showing that the Attorneys unreasonably and vexatiously pursued *quid pro quo* sexual harassment claims for Feltner, Wampler and Phelps. Viewed solely in a vacuum, the pursuit of these meritless claims might warrant the imposition of some excess attorney fees, costs, and expenses; at least those reasonably incurred in defending against them. However, because some "equitable considerations" must be considered, and because they suggest that Wabash and its counsel should not profit from their own equally sanctionable behavior, a different type sanction will be recommended. *Brown*, 830 F.2d at 1439.

In somewhat of an irony, at oral argument, Wabash first sought to cloak itself as the defender and avenging angel for the American judicial system by suggesting that their motives were pure and noble: they only wanted to bring these egregious acts before the Court so that the Court could impose whatever sanction best preserved that important institution. Later, and after Wabash's counsel had had an opportunity to discuss the question with Wabash's CEO, Jerry Erhlich ("Erhlich") the tune changed—apparently now Wabash felt that the best way to preserve our legal system was for the Attorneys' to pay Wabash between $10,000 to $15,000. This suggestion had a formulaic basis, Wabash argues that it spent between $100,000 to $150,000 in defending against all five plaintiffs' claims, and that this money would have otherwise constituted corporate profits—ten percent of which goes to the workers at Wabash through some sort of profit-sharing plan.[38] Thus, the theory goes that the Attorneys should pay this lost tithe back to Wabash so that it can then be used to reimburse Wabash workers for what they have otherwise lost.[39] There are a number of problems with this rather superficial and self-serving analysis.

First, the theory seeks to shift a portion of Wabash's defense costs to the Attorneys without any regard to apportioning those fees to only the three unsuccessful plaintiffs' cases (as opposed to Vandeventer and Russell), let alone just the offending *quid pro quo* claims. As a fee applicant, Wabash has an obligation to support its request with reasoning and facts beyond mere speculation or ephemeral conjecture, and they have failed to do so.

 Second, a major premises of Wabash's proposition is that they have incurred between $100,000 to $150,000 in attorney fees in defending this action. The only possible explanation for this eye-popping figure is that Wabash's counsel unmercifully worked

---

**38.** It would seem that if one were asking the Court for a reimbursement of excess fees, one would come to Court armed with a more precise estimate of what those fees truly were.

**39.** At the same time that this argument was being made, the Magistrate Judge observed Erhlich reading a newspaper at counsel table, and an on-the-spot correction was immediately imposed. However, Erhlich's casual attitude suggests that he did not suffer a profit-sharing loss like other Wabash employees, and, at any rate, demonstrates perhaps a clear example of Wabash's true attitude towards our legal system.

this file—to the ultimate detriment of Wabash's stockholders, profit-sharing employees, and ultimately the Court. As the Seventh Circuit has observed, an appropriate consideration in the assessment of sanctions is "whether the party seeking fees caused the litigation to be longer than necessary." *Brown*, 830 F.2d at 1439 (citing *Matter of Yagman*, 796 F.2d at 1188). "A duty of mitigation exists, and a district court should insure that the party requesting fees has not needlessly protracted the litigation." *Id.* (citing *Schwarzer, Sanctions under the new Federal Rule 11—a Closer Look.* 104 F.R.D. 181, 203 ("A party having vigorously resisted a baseless claim may therefore find that the court, in making an award, will consider its expenditures to have been excessive.")) As discussed more fully *infra*, Judge Schwarzer's comments fit neatly here.

Finally, if Wabash wants $10,000 to $15,-000 for *all* of the sanctionable conduct that it suggests occurred here, then the amount of fees that would be appropriate for what the Court has found to be truly a violation of § 1927 (the baseless *quid pro quo* claims) should amount to a good deal less. After all, one need not expend much ammunition when "shooting fish in a barrel." Unfortunately, the record demonstrates that Wabash would routinely choose a grapeshot and canister defense, when one or two well-aimed rifle shots would have done nicely. To put a seal of approval on this fee request would mean that the standard of limiting sanctions to "reasonable" fees had become all but meaningless. *In the Matter of Central Ice Cream Co.*, 836 F.2d 1068, 1074 (7th Cir.1987).

A simple examination of the record is enough to demonstrate that Wabash's counsel failed to mitigate the attorney fees that they happily passed on to Wabash. Of course, while it might be that they were goaded by Erhlich into overreacting to every claim or filing, two things are apparent: first, the case was over-staffed (four attorneys appeared for Wabash in this case); and second, it was grossly over-litigated.[40] Of course, perhaps Wabash's counsel has little experience in litigating employment discrimination matters in federal court, but that does not mean that the expense of "on-the-job" training should ultimately be defrayed through a sanction motion.

Moreover, apart from Wabash's failure to mitigate, Wabash's counsel has engaged in sanctionable conduct themselves. Aside from launching a Rule 11 motion on various issues when they had not even made a good faith effort at complying with the notice requirement of Federal Rule of Civil Procedure 11(c)(1)(A), Wabash's counsel also diligently worked to burden the Court by ignoring court orders and the Local Rules. The clearest example is the violation of the Magistrate Judge's page limitation order of January 20, 1995, when Wabash's counsel packed more than fifteen pages of text into fifteen standard size pages.[41] *See* Magistrate Judge's order of February 14, 1995, striking Wabash's brief.

Interestingly enough, the Seventh Circuit faced almost precisely the same situation in *Westinghouse Electric Corp. v. National Labor Relations Board*, 809 F.2d 419, 424–5 (7th Cir.1987). There, counsel for Westinghouse (when their request to file a longer brief was denied) nevertheless filed a brief as long as their motion had requested, "although they tried to disguise the excess by a variety of typographical techniques." For example, Westinghouse attorneys used

---

**40.** For example, Wabash filed separate motions for summary judgment as to each Plaintiff, rather than combining them all into one large motion. This resulted in costly duplication and redundant arguments. Wabash also filed a bloated motion to strike various affidavits that was rather efficiently dealt with by the trial court. Indeed, Wabash's counsel was ultimately sanctioned $1,000 for improper litigation behavior. *See*, Court Orders of September 6 and December 9, 1994. Finally, the very motion before the Court is illustrative of Wabash's overblown "scorched-earth" tactics. *See*, f.n. 44, *infra*. In

fact, given that Wabash's counsel never made an effort to comply with Rule 11 as to some of their allegations, *see* f.n. 8 *supra*, their conduct is probably sanctionable under Rule 11(c)(1)(B). At a minimum, it demonstrates that in this case Wabash and its counsel live in too large a glass house to ever be tossing rocks.

**41.** Another example, of course, was the fact that Wabash's initial brief exceeded the Local Rule page limitations without leave of Court. *See* N.D.Ind.L.R. 7.1(b).

smaller type, compacted the spacing, and used smaller margins. *Id.* When later told to comply with the rules, Westinghouse counsel simply moved "gobs of text into single-spaced footnotes, thereby leaving essentially the same number of words in the brief." *Id.* As the Seventh Circuit observed, such conduct "multiplied the proceedings" by requiring the judges and opposing counsel to examine two sets of briefs. Under § 1927, the Seventh Circuit imposed a $1,000 penalty solely on counsel. *Id. See also, Kano v. National Consumer Cooperative Bank,* 22 F.3d 899, 900 (9th Cir.1994). While the Court ultimately struck the offending brief here, it required an inordinate expenditure of Court time, and time on behalf of the Attorneys to examine the brief.[42] This is separately sanctionable conduct under § 1927, and at the very least, works to equalize the modest "excess" costs, fees and expenses that Wabash should have incurred in defending the irksome, but hardly serious, *quid pro quo* claims.

Of course, none of this excuses the behavior of the Attorneys who blindly continued to assert *quid pro quo* sexual harassment when it could not be maintained either factually or legally.[43] Clearly, some sort of sanction should be imposed for initiating, and prosecuting what has proven to be, at least in small part, a baseless, meritless, and vexatious action.

Sadly, while the Attorneys, and Wabash, and Wabash's counsel, have waged their war, the Court and the taxpayers have been the true casualties. Indeed, it can be argued that simply having the undersigned Magistrate Judge review the sanction motion cost the United States taxpayer an estimated $50,400.[44]

Thus, the question becomes: what would be the most appropriate and effective deterrent the Court can impose? The undersigned Magistrate Judge is of the belief that the Attorneys and lead Wabash counsel (attorneys Bauman and Klausen) should all be sanctioned under § 1927 for unreasonably and vexatiously multiplying these proceedings, and that a nominal payment into the Office of the Clerk (nominal, particularly in light of the expenditure made by the taxpayers) would be appropriate.[45] "While section 1927 does not authorize a sanction in the nature of a share of the court's overhead, *see Blue v. U.S. Dept. of Army,* 914 F.2d 525, 548 (4th Cir.1990) *cert. denied,* 499 U.S. 959, 111 S.Ct. 1580, 113 L.Ed.2d 645 (1991), an order directing nominal reimbursement of the cost to the Government is appropriate." *Novelty Textile Mills v. Stern,* 136 F.R.D. 63, 78 (S.D.N.Y.1991) (citing *Unique Concepts, Inc. v. Brown,* 115 F.R.D. 292, 294 (S.D.N.Y. 1987) (Section 1927 $250.00)); *Manville Sales Corp. v. Paramount Systems, Inc.,* 1988 W.L. 3855 (E.D.Pa.) at *4 (Sec. 1927;

**42.** Of course, it also delayed the proceedings because the Magistrate Judge, after striking Wabash's brief, gave them more time to submit a proper one.

**43.** Although perhaps not technically sanctionable, the submissions by the Attorneys in this case were, on the whole, very far below the quality of work that this Court is accustomed to seeing. The Attorneys should give serious consideration to not practicing in the United State District Court until such time as they have demonstrably enhanced their practice skills.

**44.** The undersigned Magistrate Judge was unfamiliar with the case when the sanction motion was assigned to him, thus necessitating a review the motion and its four volumes of supporting materials, the record of proceedings, the briefs, as well as hearing oral argument. Additionally, since the motion essentially amounted to about forty-four separate counts of sanctionable conduct (when Rule 11 and § 1927 are combined)

extensive legal research was required. Thus, it is estimated by the Magistrate Judge that, conservatively-speaking, he spent approximately 84 hours doing all those things necessary to prepare this Report and Recommendation. Ten years ago a single hour spent by a federal judge on a case was estimated to cost the United States Government $600. *See Robinson v. Moses,* 644 F.Supp. 975, 982–3 (N.D.Ind.1986) (citing *Levin and Collier, Containing the Cost of Litigation,* 37 Rutger's Law Review 219, 227 (1985)). If we just assume that a single hour of a United States Magistrate Judge in 1995 costs the United States Government the same amount, the cost to the taxpayers has amounted to $50,400.

**45.** Counsel for the Attorneys asked for sanctions at the May 18, 1995 hearing and counsel for Wabash had an opportunity to respond. Thus, both notice and an opportunity for a hearing were provided. *Roadway Express, Inc.,* 447 U.S. at 767, 100 S.Ct. at 2464. Of course, this Report and Recommendation will now serve the same function.

$500.00) *see also, Cannon v. Loyola University of Chicago,* 116 F.R.D. 244, 245 (N.D.Ill. 1987) (Rule 11).

Accordingly, it will be the recommendation of the undersigned Magistrate Judge that a nominal and equal sanction be imposed against Attorneys Crawford, Thayer, Bauman and Klausen with the sanctions to be paid to the Office of the Clerk within 60 days, provided however, that counsel can petition the Court to set aside the monetary sanction by agreeing to attend and successfully complete within the next year, a Continuing Legal Education ("CLE") seminar approved by the Court as hereinafter specified.

## VIII. CONCLUSION

When Wabash filed its sanction motion, it must have known that the Court would have to write the equivalent of a novelette just to address all of the alleged acts of sanctionable conduct. As we now know, Wabash could have saved the Court, and itself, considerable time and expense by just exercising some reasonable restraint. At any rate, it will now be up to Chief Judge Sharp to write the epilogue to this sorry tale of rancor and retribution. Before he does, it would be nice to hear some voluntary *mea culpas*—a doubtful prospect from this cast of characters.

Nonetheless, salutary responses are needed: the Attorneys are long overdue for an epiphany—that this case is not, and never was about, *quid pro quo* sexual harassment; Wabash, on the other hand, should abandon its role as the hunter, lest it become the hunted.[46] In other words, introspective analysis by counsel is called for, and will be addressed by this sanction recommendation, *infra.*

Of course, the Court could spend even more time parsing out recoverable attorney time spent by Wabash on the *quid pro quo* sexual harassment claims (it ought not be much) which could then be applied to a reasonable (indeed, modest) hourly rate. However, such a microscopic and time-consuming analysis would do no more to further the goal of deterrence than what is here being recommended. After all, a modest penalty paid to the Clerk, or, in lieu thereof, a modest fee paid for a CLE seminar (together with the lost attorney time in attending such a seminar) will probably inflict sufficient sting. Moreover, the knowledge gained by counsel at such a seminar might work to prevent future similar conduct by both sides; and if so, this too will be a deterrent.

Needless to say, if counsel want to continue to litigate as if this were a back-alley knife fight, then escalating, and harsher sanctions can always be imposed. That is where the introspective analysis comes in. All counsel who appeared in this case should be required to read the Seventh Circuit's "Standards for Professional Conduct," *see,* N.D.Ind.L.R. 83.5(g), and then certify that they have done so. However, that alone is not enough. Each counsel should also certify that they "shall abide by [the Standards] in all cases in this court." *Id.* Thereafter, if the Court observes *any* violations of those standards, by *any* of the certifying counsel, then discipline in accordance with N.D.Ind.L.R. 83.6.4 (to include possible suspension from practice before this court) should be actively considered. That should inspire introspection.

In conclusion then, it is the recommendation of the undersigned Magistrate Judge that attorneys Crawford, Thayer, Bauman and Klausen each pay into the Office of the Clerk within sixty days the sum of $500.00 as a nominal sanction under § 1927; provided, however, that counsel can petition the Court to set aside the monetary sanction by agreeing to attend and successfully completing, within one year from the date of the Court's order, a CLE seminar approved by the Court as follows: attorneys Crawford and Thayer should be directed to attend a CLE course on the substantive provisions of sexual harassment; attorneys Bauman and Klausen should be required to attend a CLE seminar on Rule 11 and/or federal practice. Each CLE course should not be less than six credit hours. Of course, if counsel can find a CLE course that more appropriately addresses the conduct that has given rise to the

---

**46.** The Attorneys, Wabash, and counsel for Wabash, should all become familiar with the sanction provisions of Fed.R.App.P. 38, if they pursue this case beyond the District Court.

sanctions here, and if they can appropriately demonstrate that the proposed CLE course will address those shortcomings, then they may apply to the Court for substitution. The certifications regarding the Seventh Circuit's "Standards for Professional Conduct" should be filed within thirty days.

Pursuant to section 636(b)(1)(C) of the Act the parties have ten days after being served with a copy of this Report and Recommendation to file written objections with the Clerk of the Court. Failure to object may constitute a waiver of objection on appeal. *See* N.D.Ind.L.R. 72.1(d)(2).